**STATE of Iowa, Appellee,**

v.

**Shawn Patrick McKNIGHT, Appellant.**

No. 93–53.

Supreme Court of Iowa.

Jan. 19, 1994.

Linda Del Gallo, State Appellate Defender, and B. John Burns, Asst. State Appellate Defender, for appellant.

John O. Haraldson of the Barrett Law Offices, Des Moines, for amicus curiae Iowa Civ. Liberties Union Foundation, Inc., in support of appellant.

Bonnie J. Campbell, Atty. Gen., Richard J. Bennett, Asst. Atty. Gen., Richard Crowl, County Atty., and Timothy O'Grady, Asst. County Atty., for appellee.

Considered by LARSON, P.J., and LAVORATO, SNELL, ANDREASEN, and TERNUS, JJ.

LAVORATO, Justice.

Bigotry is again rearing its ugly head in this country. Violent or harassing crimes motivated by racism, anti-Semitism, sexism, and other forms of bias have caused legislatures to pass statutes criminalizing such conduct. Writers have tagged such laws "hate

crimes" statutes. The Iowa legislature passed such a statute. *See* Iowa Code § 729.5(3)(a) (1991). A district court judge found Shawn Patrick McKnight guilty of violating the statute. He appeals, contending that the statute violates his First Amendment right of free speech. He also thinks the statute is overbroad. We affirm.

## I. *Background Facts and Proceedings.*

In the early morning hours of May 2, 1992, Jonathan Rone was driving west on Broadway Street in Council Bluffs when a car swerved toward his car. Rone had to take evasive action to avoid a collision.

Seconds later the same car swerved and struck Rone's car, causing him to lose control, and sending his car into a 360-degree spin.

Rone followed the car to get the license plate number. The car stopped and two white males got out of it and approached Rone's car. One of these individuals was McKnight. Rone is black.

McKnight began assaulting Rone, striking him five or six times. McKnight's companion also assaulted Rone.

There were witnesses to the collision and assault. Two of the witnesses asked McKnight what the problem was. McKnight responded, "The nigger ran us off the road." One of the witnesses heard McKnight say to Rone, "You stupid nigger, what do you think this is, L.A.?" When the witness tried to intervene, McKnight said to him, "He's black. We're white, and we have to stick together against them."

McKnight and his cohort eventually stopped their assault on Rone and returned to their car. As they left, McKnight was overheard to say, "We'll take care of the nigger later."

Police officers arrived on the scene and interviewed Rone and the witnesses. The officers ran the license plate number Rone had copied and found it was registered to McKnight. The officers went to McKnight's apartment where they arrested him.

The officers asked McKnight if he had just been involved in an accident. At first McKnight said "no" and then asked, "You mean when that nigger ran us off the road?" McKnight proceeded to explain, in his words, how this "nigger" ran him off the road, but he "didn't wait for no police" because he "didn't have time." McKnight claimed he gave his license plate number to the "nigger and that was good enough."

When the officers asked if there had been an assault, McKnight at first said "no" but immediately changed his story and said that the "nigger" tried to "swing" on him but that he had "picked on the wrong white boy." McKnight made several references to Los Angeles and how "the niggers don't run this town."

This incident prompted the State to file a three-count trial information against McKnight. Count I alleged second-degree criminal mischief. *See* Iowa Code §§ 716.1, 716.4. Count II alleged assault causing bodily injury. *See* Iowa Code §§ 708.1(1), 708.-2(2). Count III—the one pertinent to this appeal—alleged infringement of individual rights under the then applicable language of Iowa's "hate crimes" statute. *See* Iowa Code § 729.5(3)(a). Section 729.5(3)(a) was of short duration and was repealed in 1992. *See* 1992 Iowa Acts ch. 1157, § 7.

McKnight filed a motion to dismiss Count III, alleging that Iowa Code section 729.5(3) was (1) unconstitutionally vague, (2) violated free speech and thought, (3) denied equal protection, and (4) was overbroad. Following a hearing, the district court denied the motion in its entirety.

The State dismissed Count II (assault causing bodily injury) and amended Count I (second-degree criminal mischief) to allege third-degree criminal mischief. *See* Iowa Code §§ 716.1, 716.5.

A bench trial followed, with the stipulated evidence consisting of the minutes of testimony. The district court found McKnight guilty of both surviving counts: Count I (third-degree criminal mischief) and Count III (infringement of individual rights).

The district court imposed concurrent terms of imprisonment not to exceed two years on the two counts. The court suspended the sentences and placed McKnight at a

residential correctional facility until he received the maximum benefit.

It is from his conviction for infringement of individual rights under section 729.5(3)(a) that McKnight appeals.

## II. *Scope of Review.*

█ Because constitutional questions are raised, our review is de novo in light of the totality of the circumstances. *State v. Taft*, 506 N.W.2d 757, 762 (Iowa 1993). We presume statutes are constitutional. *State v. Ryan*, 501 N.W.2d 516, 517 (Iowa 1993). The challenger bears the heavy burden to rebut this presumption. *State v. Mehner*, 480 N.W.2d 872, 878 (Iowa 1992). We engage in any reasonable construction of a statute to uphold it. *Id.*

## III. *First Amendment Right of Free Speech.*

At the time of this incident Iowa Code section 729.5(3) provided:

A person who maliciously and intentionally intimidates or interferes with another person because of that person's race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, or disability and while doing so commits any of the following acts, is guilty of an aggravated misdemeanor:

a. Commits an assault, as defined in section 708.1, upon that person or a third person.

b. Commits an act of criminal mischief, as defined in section 716.1, upon that person or a third person.

This provision resembles the model legislation drafted by the Anti–Defamation League of B'nai B'rith in 1981 as a response to a trend of racist and anti-Semitic crime. The model legislation is an intimidation provision that enhances penalties for "certain already criminal offenses when they are committed by reason of the victim's actual or perceived race, sex, color, religion, sexual orientation, or national origin." Susan Gellman, *Sticks and Stones Can Put You In Jail, But Can Words Increase Your Sentence? Constitutional and Policy Dilemmas of Ethnic In-timidation Laws*, 39 U.C.L.A.L.Rev. 333, 339–40 (1991) [hereinafter Gellman].

In 1992 the Iowa legislature revamped Iowa Code chapter 729 (Infringement of Individual Rights). It repealed section 729.-5(3), along with subsections 4 and 5 of section 729.5. *See* 1992 Iowa Acts ch. 1157, § 7. The legislature enacted in their place new "hate crimes" provisions and specific enhancement penalties. *See generally* 1992 Iowa Acts ch. 1157 and Iowa Code ch. 729A (1993).

The First Amendment to the United States Constitution prohibits Congress from making any law "abridging the freedom of speech." U.S. Const. amend. I. The First Amendment is made binding on the states through the Fourteenth Amendment. U.S. Const. amend. XIV; *Gitlow v. New York*, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). In his original brief, McKnight relies heavily on two cases to support his contention that section 729.5(3) violates free speech under the First Amendment: *R.A.V. v. St. Paul*, 505 U.S. ——, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), and *State v. Mitchell (Mitchell I)*, 169 Wis.2d 153, 485 N.W.2d 807 (1992).

A. *R.A.V.* In *R.A.V.*, a juvenile and several other teenagers allegedly burned a homemade cross in the yard of a black family living across the street from the petitioner. The juvenile was charged with violating Minnesota's hate crimes statute but he did not challenge that statute. The juvenile was also charged under a St. Paul ordinance that made it a misdemeanor to

place[ ] on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender....

The juvenile challenged the ordinance as being facially invalid under the First Amendment because, among other things, it was impermissibly content-based. The Minnesota Supreme Court rejected the challenge. The court concluded the language—"arouses anger, alarm or resentment in others"—constituted conduct amounting to "fighting

words": that is, "conduct that itself inflicts injury or tends to incite immediate violence." *R.A.V.*, 505 U.S. at ——, 112 S.Ct. at 2451, 120 L.Ed.2d at 316. Relying on *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031, 1035 (1942), the Minnesota court held that the ordinance regulated only expression that the First Amendment did not protect.

The United States Supreme Court accepted the Minnesota Supreme Court's interpretation that the ordinance was limited to fighting words. Nevertheless, the United States Supreme Court concluded the ordinance violated the First Amendment because the ordinance applied only to specific "fighting words": those "that insult, or provoke violence, 'on the basis of race, color, creed, religion or gender.'" *R.A.V.*, 505 U.S. at ——, 112 S.Ct. at 2547, 120 L.Ed.2d at 323. Despite language to the contrary in earlier cases, the Supreme Court was now saying that "fighting words" could be within the area of constitutionally protected speech. The Court pointed out that the

First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid.

*Id.* at ——, 112 S.Ct. at 2542, 120 L.Ed.2d at 317 (citations omitted).

The problem with the ordinance in *R.A.V.* was that it regulated "fighting words" that contained messages of bias-motivated hatred and messages based on notions of racial supremacy. As odious as these messages are, they are nevertheless pure or symbolic speech protected by the First Amendment. *Id.* at ——, 112 S.Ct. at 2547, 120 L.Ed.2d at 323.

Although the government may constitutionally regulate "fighting words," it may not do so by systematically choosing to regulate only those "fighting words" with which it disagrees. When the government undertakes to regulate "fighting words" this way, it is attempting to silence speech on the basis of its content. In condemning the St. Paul ordinance on this basis, the Supreme Court said:

[T]he only interest distinctly served by the content limitation is that of displaying the city council's special hostility towards the particular biases thus singled out. That is precisely what the First Amendment forbids. The politicians of St. Paul are entitled to express that hostility—but not through the means of imposing unique limitations upon speakers who (however benightedly) disagree.

*Id.* at ——, 112 S.Ct. at 2550, 120 L.Ed.2d at 326.

B. *State v. Mitchell (Mitchell I).* One day after the United States Supreme Court announced its decision in *R.A.V.*, the Wisconsin Supreme Court decided *State v. Mitchell (Mitchell I)*, 169 Wis.2d 153, 485 N.W.2d 807 (1992). In *Mitchell I*, the Wisconsin court declared a hate crimes statute—very similar to the one here—unconstitutional because it violated the First Amendment. The Wisconsin statute pertinently provided:

(1) If a person does all of the following, the penalties for the underlying crime are increased . . . . :

(a) Commits a crime under chs. 939 to 948.

(b) Intentionally selects the person against whom the crime under par. (a) is committed or selects the property which is damaged or otherwise affected by the crime under par. (a) because of the race, religion, color, disability, sexual orientation, national origin or ancestry of that person or the owner or occupant of that property.

The facts in *Mitchell I* were these. On a fall night in 1989, a group of young black men and boys, including Mitchell, went out for a walk. They had just discussed a scene from *Mississippi Burning*, in which a white man beat a black child who was praying. Mitchell asked the group, "Do you all feel hyped up to move on some white people?" About then, a white child walked by. As the child walked by, Mitchell said, "You all want to ____ somebody up? There goes a white boy; go get him." The group then attacked the child, beat him senseless, and took his tennis shoes. The victim was in a coma for four days.

Borrowing from the analysis in *R.A.V.*, the Wisconsin court in *Mitchell I* reasoned that

[t]he ideological content of the thought targeted by the hate crimes statute is identical to that targeted by the St. Paul ordinance—racial or other discriminatory animus. And, like the United States Supreme Court, we conclude that the legislature may not single out and punish that ideological content.

Thus, the hate crimes statute is facially invalid because it directly punishes a defendant's constitutionally protected thought.

*Mitchell I,* 169 Wis.2d at 172, 485 N.W.2d at 815.

In his original brief, McKnight relies heavily on *Mitchell I.* He points out that the Iowa statute and the Wisconsin statute are similar in "all relevant respects." He also points out that both statutes have a speech element and a nonverbal element. And both regulate the speech element on the basis of certain prohibited subjects. McKnight concedes that the legislature may criminalize the nonverbal element. But because the nonverbal element can be criminalized—he argues—does not save the content-based restriction from violating the First Amendment. In support of his argument he cites this passage from *Mitchell I:*

Without doubt the hate crimes statute punishes bigoted thought. The state asserts that the statute punishes only the "conduct" of intentional selection of a victim. We disagree. Selection of a victim is an element of the underlying offense, part of the defendant's "intent" in committing the crime. In any assault upon an individual there is a selection of the victim. The statute punishes the "because of" aspect of the defendant's selection, the *reason* the defendant selected the victim, the *motive* behind the selection.

. . . .

... Because all of the crimes under chs. 939 to 948, Stats., are already punishable, all that remains is an additional punishment for the defendant's motive in selecting the victim. The punishment of the defendant's bigoted motive by the hate crimes statute directly implicates and encroaches upon First Amendment rights.

*Id.* at 166, 485 N.W.2d at 812.

McKnight notes that the *Mitchell I* court relied heavily in its analysis on this language from a recent commentary on hate crimes statutes:

Under the [Anti–Defamation League model statute], a charge of ethnic intimidation must always be predicated on certain offenses proscribed elsewhere in a state's criminal code. As those offenses are already punishable, all that remains is an additional penalty for the actor's *reasons* for his or her actions. The model statute does not address effects, state of mind, or a change in the character of the offense, but only the thoughts and ideas that propelled the actor to act. The government could not, of course, punish these thoughts and ideas independently. That they are held by one who commits a crime because of his or her beliefs does not remove the constitutional shield. Of course, the First Amendment protection guaranteed the actor's thoughts does not protect him or her from prosecution for the associated action. Neither, however, does the state's power to punish the action remove the constitutional barrier to punishing the thoughts.

*Id.* (citing with approval Gellman, 39 U.C.L.A.L.Rev. at 363).

Like the Wisconsin statute, Iowa's hate crimes statute already punishes the underlying crime: in this case, assault. And, like the Wisconsin statute, Iowa's hate crimes statute also punishes the defendant's motive in selecting the victim: in this case, color.

C. *Wisconsin v. Mitchell (Mitchell II).* The United States Supreme Court granted certiorari in *Wisconsin v. Mitchell (Mitchell II),* 508 U.S. ——, ——, 113 S.Ct. 2194, 2198, 124 L.Ed.2d 436, 443 (1993), "because of the importance of the question presented and the existence of a conflict of authority among state high courts on the constitutionality of statutes similar to Wisconsin's penalty enhancement provision." After McKnight submitted his brief, the Supreme Court decided *Mitchell II.*

In *Mitchell II,* the Supreme Court rejected the same content-based objection to the Wisconsin statute that McKnight urges upon us regarding section 729.5(3). Although agreeing with the State that the Wisconsin statute punishes only conduct and not bigoted thought, nevertheless the Supreme Court in *Mitchell II* believed that the State's argument did not dispose of Mitchell's First Amendment challenge. The Court then proceeded to explain away this challenge.

The Court began its analysis by noting that its prior cases reject the "view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Id.* at ——, 113 S.Ct. at 2199, 124 L.Ed.2d at 444 (citations omitted). "Thus"— the Court continued—"a physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment." *Id.* at ——, 113 S.Ct. at 2199, 124 L.Ed.2d at 444. Nor are violence and other types of potentially expressive activities that produce special harms distinct from their communicative impact entitled to constitutional protection. *Id.* at ——, 113 S.Ct. at 2199, 124 L.Ed.2d at 444–45 (citation omitted).

The Supreme Court acknowledged a possible First Amendment argument because under the Wisconsin statute

> the same criminal conduct may be more heavily punished if the victim is selected because of his race or other protected status than if no such motive obtained. Thus, although the statute punishes criminal conduct, it enhances the maximum penalty for conduct motivated by a discriminatory point of view more severely than the same conduct engaged in for some other reason or for no reason at all.

*Id.* at ——, 113 S.Ct. at 2199, 124 L.Ed.2d at 445. But the Court was not swayed by Mitchell's argument that this type of enhancement punishment violated the First Amendment because the only reason for the punishment was to punish offenders' bigoted beliefs. *Id.* at ——, 113 S.Ct. at 2199, 124 L.Ed.2d at 445.

In rejecting Mitchell's argument the Court drew on two analogies: the role that motive plays in (1) criminal sentencing and (2) federal and state antidiscrimination laws.

1. *Motive in criminal sentencing.* The Court noted that sentencing judges have traditionally considered

> a wide variety of factors in addition to evidence bearing on guilt in determining what sentence to impose on a convicted defendant. The defendant's motive for committing the offense is one important factor. Thus, in many states the commission of a murder, or other capital offense, for pecuniary gain is a separate aggravating circumstance under the capital-sentencing statute.

*Id.* at ——, 113 S.Ct. at 2199, 124 L.Ed.2d at 445 (citations omitted).

The Court cautioned, however, that

> a defendant's abstract beliefs, however obnoxious to most people, may not be taken into consideration by a sentencing judge.... [Where] the evidence proved nothing more than [the defendant's] abstract beliefs, we [have] held that its admission violated the defendant's First Amendment rights.

*Id.* at ——, 113 S.Ct. at 2200, 124 L.Ed.2d at 445 (citations omitted).

On the other hand, the Court noted that

> the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment. [In one case we did allow] the sentencing judge to take into account the defendant's racial animus towards his victim. The evidence in that case showed that the defendant's membership in the Black Liberation Army and desire to provoke a "race war" were related to the murder of a white man for which he was convicted. Because the elements of racial hatred in [the] murder were relevant to several aggravating factors, we held that the trial judge permissibly took this evidence into account in sentencing the defendant to death.

*Id.* at ——, 113 S.Ct. at 2200, 124 L.Ed.2d at 445–46 (citations omitted).

2. *Motive in antidiscrimination laws.* Turning to the federal and state antidiscrimination laws, the Court in *Mitchell II* compared the role motive plays under the Wisconsin statute with the role motive plays under the antidiscrimination laws. The Court concluded that the roles were the same and emphasized that it had previously upheld the antidiscrimination laws against constitutional challenges. The Court cited Title VII as an example: that statute makes it unlawful for an employer to discriminate against an employee *"because of* such individual's race, color, religion, sex, or national origin." *Id.* at ——, 113 S.Ct. at 2200, 124 L.Ed.2d at 446 (citation omitted). The Court also pointed out that in *R.A.V.*, it had cited Title VII as an example of a permissible content-neutral regulation of conduct. *Id.* at ——, 113 S.Ct. at 2200, 124 L.Ed.2d at 446.

3. *R.A.V. distinguished.* Distinguishing *R.A.V.*, the Court in *Mitchell II* emphasized that

> [n]othing in our decision last Term in *R.A.V.* compels a different result here. That case involved a First Amendment challenge to a municipal ordinance prohibiting the use of " 'fighting words' that insult, or provoke violence, 'on the basis of race, color, creed, religion or gender.' " Because the ordinance only proscribed a class of "fighting words" deemed particularly offensive by the city—*i.e.*, those "that contain ... messages of 'bias-motivated' hatred," we held that it violated the rule against content-based discrimination. But whereas the ordinance struck down in *R.A.V.* was explicitly directed at expression (*i.e.*, "speech" or "messages,"), *the statute in this case is aimed at conduct unprotected by the First Amendment.*

*Id.* at ——, 113 S.Ct. at 2200–2201, 124 L.Ed.2d at 446–47 (citations omitted) (emphasis added).

As a final answer to *R.A.V.*, the Court saw the penalty enhancement provision as something more than the State's mere disagreement with bigoted thoughts:

> Moreover, the Wisconsin statute singles out for enhancement bias-inspired conduct because this conduct is thought to inflict greater individual and societal harm. For example, according to the State and its *amici*, bias-motivated crimes are likely to provoke retaliatory crimes, inflict distinct emotional harms on their victims, and incite community unrest. The State's desire to redress these perceived harms provides an adequate explanation for its penalty-enhancement provision over and above mere disagreement with offenders' beliefs or biases.

*Id.* at ——, 113 S.Ct. at 2201, 124 L.Ed.2d at 447 (citations omitted).

The difference between *R.A.V.* and *Mitchell II* boils down to this. Had McKnight limited his attack on Rone to mere words, the First Amendment would have protected his right to do so. He lost that protection when his racial bias toward blacks drove him to couple those words with assaultive conduct toward Rone, who is black. In these circumstances, the words and the assault are inextricably intertwined for First Amendment purposes.

4. *McKnight's response to Mitchell II.* In his reply brief McKnight tries to distinguish *Mitchell II.* In an about-face from his original brief, McKnight now contends there is a material difference between the Wisconsin statute and section 729.5(3). The difference—he says—is that the Wisconsin statute is a penalty enhancement provision whereas section 729.5(3) is not. He thinks section 729.5(3) is different because it defines a new offense, one that punishes a person for maliciously and intentionally intimidating and interfering with another person because of race, color, etc., in combination with the additional element of assault or criminal mischief. An essential element of the offense, he says, is expressing oneself by intimidation and interference on one of the forbidden subjects in section 729.5(3), the very type of content-based restriction on speech outlawed in *R.A.V.*

■ Implicit in McKnight's contention is that one can only intimidate and interfere by speech. Little imagination is needed to conjure up examples of intimidation and interference based on conduct alone. Moreover, as we earlier noted, *Mitchell II* holds that bias motivated speech, coupled with assaul-

tive or other nonverbal, proscribed conduct, is not protected by the First Amendment. And that is exactly what section 729.5(3) forbids. In contrast, *R.A.V.* holds that if a statute proscribes speech or thought *alone* based on disfavored subjects, the First Amendment is implicated.

Contrary to McKnight's belated contention, we see no meaningful difference between the Wisconsin statute and Iowa Code section 729.5(3). Both are directed at nonverbal, proscribed conduct—for example, assault—motivated by bias. Both proscribe such conduct in other criminal statutes. Both increase punishment for the proscribed conduct. In the case of section 729.5(3), the enhancement is from a misdemeanor to an aggravated misdemeanor; in the case of the Wisconsin statute, the penalties are simply increased. In each instance, the legislatures had good reason for the enhancement provisions. Because of these similarities, *Mitchell II* controls our decision. Like the Wisconsin statute, section 729.5(3) is, we hold, aimed at conduct unprotected by the First Amendment. We therefore conclude section 729.-5(3) does not violate McKnight's First Amendment right of free speech.

Left for us to consider is McKnight's challenge that section 729.5(3) is unconstitutionally overbroad.

### IV. *Overbreadth.*

■ A statute is unconstitutionally overbroad "if it attempts to achieve a governmental purpose to control or prevent activities constitutionally subject to state regulation by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *City of Maquoketa v. Russell,* 484 N.W.2d 179, 181 (Iowa 1992) (citation omitted). Like his first challenge, McKnight relies heavily on *Mitchell I,* which found the Wisconsin hate crimes statute to be unconstitutionally overbroad. The reason, the Wisconsin court gave, was that the prosecution may use a defendant's prior speech or association to prove that the defendant intentionally selected the victim because of the victim's protected status. So, the court concluded, the statute impermissibly chills free expression on the forbidden subjects because one

may fear enhanced punishment if one should in the future commit a hate crimes offense.

In *Mitchell II,* the United States Supreme Court rejected the same overbreadth contention, reasoning that

> [t]he sort of chill envisioned here is far more attenuated and unlikely than that contemplated in traditional "overbreadth" cases. We must conjure up a vision of a Wisconsin citizen suppressing his unpopular bigoted opinions for fear that if he later commits an offense covered by the statute, these opinions will be offered at trial to establish that he selected his victim on account of the victim's protected status, thus qualifying him for penalty-enhancement. To stay within the realm of rationality, we must surely put to one side minor misdemeanor offenses covered by the statute, such as negligent operation of a motor vehicle (Wis.Stat. § 941.01 (1989–1990)); for it is difficult, if not impossible, to conceive of a situation where such offenses would be racially motivated. We are left, then, with the prospect of a citizen suppressing his bigoted beliefs for fear that evidence of such beliefs will be introduced against him at trial if he commits a more serious offense against person or property. This is simply too speculative a hypothesis to support Mitchell's overbreadth claim.

*Mitchell II,* 508 U.S. at ——, 113 S.Ct. at 2201, 124 L.Ed.2d at 447–48.

Additionally, the Court pointed out that trial courts in criminal cases commonly admit into evidence a defendant's previous statements to prove motive or intent. Such statements, of course, must meet the tests of relevancy and reliability. If those tests are met, the First Amendment does not prohibit the evidentiary use of such speech. *Id.* at ——, 113 S.Ct. at 2201–2202, 124 L.Ed.2d at 448.

For the reasons expressed in *Mitchell II,* we likewise hold that section 729.5(3) is not unconstitutionally overbroad.

### V. *Disposition.*

In sum, we hold that Iowa Code section 729.5(3) does not violate McKnight's First Amendment right of free speech. Nor is the

statute unconstitutionally overbroad. We therefore affirm his conviction.

**AFFIRMED.**