# IN THE SUPREME COURT OF IOWA

No. 08–1845

Filed December 23, 2010

**STATE OF IOWA,**

    Appellee,

vs.

**MARK THOMAS HENNINGS,**

    Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Webster County, Joel E. Swanson, Judge.

Defendant appeals conviction arguing there was insufficient evidence to sustain his conviction under Iowa's hate-crime statute. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Theresa R. Wilson, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Kyle P. Hanson, Assistant Attorney General, Timothy N. Schott, County Attorney, and Ricki L. Osborn and Jennifer J. Bonzer, Assistant County Attorneys, for appellee.

**STREIT, Justice**.

Mark Hennings was convicted under Iowa's hate-crime statute after he ran over a twelve-year-old African-American boy. The evidence was sufficient to support the jury verdict that Hennings acted "because of" the victim's race or color. Additionally, the district court sufficiently stated reasons on the record for the decision to sentence Hennings to consecutive sentences. We affirm the judgment of the district court.

## I. Background Facts and Prior Proceedings.

On the morning of Saturday, June 2, 2007, twelve-year-old A.M., thirteen-year-old J.M., eleven-year-old D.G., and thirteen or fourteen-year-olds D.M.G. and K.W., met up at the Frontier Days parade in Fort Dodge. All five boys are African-American.

After the parade, the boys planned to go swimming. The boys were walking in the street when they heard a vehicle approaching and moved to the sidewalk. Hennings, who is white, drove past the boys in a navy blue Ford Ranger pickup and shouted at the boys to "get the fuck[1] off the road." K.W. yelled back at Hennings, "[W]e don't have to get the fuck off the street."

Hennings stopped his truck and got out of the truck carrying a pocket knife with a blue handle and a serrated blade between three and four inches long. J.M. testified Hennings threatened the boys with the knife. The boys ran away toward a parking lot, but K.W. stopped running and stood his ground. K.W. testified he told Hennings "if you drop the knife," "we'll beat [your] ass." When the other boys realized K.W. had stayed behind, they ran back toward him. When they got back

---

[1]Because the language used by the defendant is the central evidence in support of the hate-crime charge, we have included such language, despite its offensive nature, in this opinion.

to K.W., Hennings walked back to his truck. Hennings called the boys "fucking niggers" as he got into his truck.

Hennings sped off and the boys continued walking. A.M. realized he had dropped his swim trunks by the parking lot and went to retrieve them. Meanwhile, Hennings circled back around toward the boys. As the boys were crossing a street, they saw Hennings run a stop sign and begin heading towards them in his truck. Hennings drove his truck in the center of the street and aimed for the boys. The boys ran and some climbed onto a brick retaining wall for protection.

When the four boys reached safety, Hennings changed direction and began aiming for A.M., who lagged behind the others. A.M. ran side-to-side hoping to evade Hennings, but Hennings swerved his truck to follow A.M. A.M. was soon hit, and the truck's passenger-side tires drove over him. Hennings then left the scene.

Two bystanders observed the incident and testified at trial. Beth Cox testified that from her desk at work she saw Hennings stop, threaten the boys, drive away, and then circle back around. She started to call 911, but then decided to check on the boys and saw A.M. injured in the street. The second bystander, State Senator Daryl Beall, called 911 and exclaimed, "There is a young man that was hit, a car was chasing him and ran over him."

A.M. was transported to the hospital and treated for abrasions to his face, head, shoulders, elbow, and thighs. He also had a potentially fatal laceration to his liver with internal bleeding, but the injury healed without treatment. A.M. stayed in the hospital for observation and suffered permanent scarring and discoloration across his body, including on his face.

The next day, police officers Brad Wilkins and Dan Charlson obtained a search warrant. Wilkins and Charlson went to Hennings' home to execute the warrant, where they spoke with Hennings and his parents. Wilkins recorded the encounter on a digital recorder, part of which was played for the jury. Hennings' comments included the following:

> I came around the corner . . . there's a big group of monkeys standing in the fuckin road . . . grabbing every which way . . . I didn't think I hit any of 'em . . . I think I hit a pothole in the road . . . I think I missed all of 'em.

> I came around the corner . . . they were all standing out in the road and this . . . I beeped my horn and they just fled . . . completely across the road.

> Some went that way . . . some went that way . . . I started hitting the brake and trying to . . . go for openings but they just . . . keep going like this . . . like a normal fuckin monkey.

> What . . . fuckin nigger don't have enough sense to stay out the fuckin road . . . they deserve to get hit.

Wilkins then stated, "I figure you don't like black people?" And Hennings' mother asked, "Why didn't you wait for 'em to move?" Hennings then said, "When they're standing in fuckin road like stupid monkeys."

Hennings' parents suggested the complaint against Hennings was manufactured because the family was well-known in Fort Dodge and not well-liked because of their opinions towards race. Wilkins responded there were witnesses to the incident that were both black and white and were not related to each other.

When asked, Hennings denied having a knife and physically tried to prevent the officers from searching and seizing his truck. Eventually, the officers executed the search warrant. They found a silver-handled knife in the glove compartment of the truck and a blue-handled knife

with a serrated blade in Hennings' bedroom dresser. The officers left Hennings' property, taking the truck with them. During the encounter, Hennings did not ask about A.M.'s condition or show remorse for his actions.

A criminalist for the Iowa Division of Criminal Investigation analyzed the truck and A.M.'s clothing. He found debris had been wiped out from the truck's underbody, marks on A.M.'s shirt, and damage to the truck's grille that were consistent with the truck running over A.M.

The State charged Hennings with count I, attempted murder in violation of Iowa Code section 707.11 (2005); count II, willful injury in violation of section 708.4(1); and count III, assault in violation of individual rights with the intent to inflict a serious injury in violation of sections 708.2C(1), 708.2C(2), and 729A.2(1).

A jury convicted Hennings of the lesser-included offenses for counts I and II: assault with intent to inflict serious injury and willful injury causing bodily injury. The jury also convicted Hennings of count III, assault in violation of individual rights with the intent to inflict a serious injury. The district court granted a motion to dismiss count I because the court held it merged with count II, as a lesser-included offense. Hennings was sentenced to an indeterminate term of imprisonment not to exceed five years for both counts II and III. The district court ordered the sentences to run consecutively.

Hennings appealed his conviction under count III, arguing the conviction is not supported by substantial evidence because the evidence would not allow a rational jury to conclude beyond a reasonable doubt that Hennings acted "because of" A.M.'s race. Hennings also appealed his consecutive sentences, arguing the district court did not provide reasons on the record for imposing consecutive terms of imprisonment.

The court of appeals affirmed Hennings' conviction, but vacated his sentence and remanded for resentencing. This court granted further review.

## II. Scope of Review.

Sufficiency-of-the-evidence claims are reviewed for correction of errors at law. *State v. Quinn*, 691 N.W.2d 403, 407 (Iowa 2005). The jury's verdict is binding upon a reviewing court unless there is an absence of substantial evidence in the record to sustain it. *State v. Schrier*, 300 N.W.2d 305, 306 (Iowa 1981). "Evidence is substantial if it would convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *State v. Jorgensen*, 758 N.W.2d 830, 834 (Iowa 2008).

> When reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State, including legitimate inferences and presumptions which may fairly and reasonably be deduced from the evidence in the record.

*State v. Leckington*, 713 N.W.2d 208, 213 (Iowa 2006).

This court reviews sentences imposed in a criminal case for correction of errors at law. Iowa R. App. P. 6.907; *State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002). "We will not reverse the decision of the district court absent an abuse of discretion or some defect in the sentencing procedure." *Formaro*, 638 N.W.2d at 724.

## III. Merits.

**A. Sufficiency of the Evidence.** Hennings argues there was insufficient evidence to support the jury's conviction under count III. Hennings was convicted of assault in violation of individual rights, with the intent to inflict a serious injury under Iowa Code sections 708.2C(1), 708.2C(2), and 729A.2(1). Iowa Code chapter 729A establishes hate

crimes in Iowa.[2]  Section 729A.2 defines a hate crime as "one of the following public offenses when committed against a person or a person's property because of the person's race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, or disability." Assault in violation of individual rights under section 708.2C is listed as one of the enumerated public offenses.  Iowa Code § 729A.2(1).  Under section 708.2C, " 'assault in violation of individual rights' means an assault, as defined in section 708.1, which is a hate crime as defined in section 729A.2."  *Id.* § 708.2C(1).  Hennings was convicted under section 708.2C(2), which provides: "A person who commits an assault in violation of individual rights, with the intent to inflict a serious injury upon another, is guilty of a class 'D' felony."

Hennings argues he could not be convicted under count III because the State did not present sufficient evidence to establish beyond a reasonable doubt that the assault was committed "because of" the victim's race or color, as required by section 729A.2.  Hennings does not contest that he is racist or that he used racially derogatory terms when discussing the incident with Wilkins.  Hennings argues, however, it is "just as likely" his actions were motivated by the boys' presence in the road and K.W.'s retorts to Hennings.  Hennings argues "it is reasonable to think Hennings would have acted in a similar way regardless of the race of the boys blocking the road."

There are essentially three categories of defendants to whom the state might try to apply hate-crime laws, such as Iowa's chapter 729A.

The first category involves an individual whose single motivation in an assault is something other than the protected status of the victim,

---

[2]This court previously upheld a predecessor hate-crime statute against a constitutional challenge in *State v. McKnight*, 511 N.W.2d 389, 396 (Iowa 1994).

such as jealousy or greed, but the individual also happens to be racist. An individual cannot be convicted under section 729A.2 for such action because it cannot be said that such an individual acted "because of" the victim's protected status. *See In re M.S.*, 896 P.2d 1365, 1377 (Cal. 1995) (noting, in analyzing California's hate-crime statute, that "the Legislature has not sought to punish offenses committed by a person who entertains in some degree racial, religious or other bias, but whose bias is not what motivated the offense").

Hate crimes such as section 729A.2 avoid constitutional concerns by excluding crimes committed by defendants who are biased, but who commit their crimes for other reasons. *Cf. Wisconsin v. Mitchell*, 508 U.S. 476, 485, 113 S. Ct. 2194, 2199–2200, 124 L. Ed. 2d 436, 445 (1993) (noting, while upholding a hate-crime statute to constitutional challenge, that in the sentencing context, "[t]he defendant's motive for committing the offense is one important factor . . . [b]ut it is equally true that a defendant's abstract beliefs, however obnoxious to most people, may not be taken into consideration by a sentencing judge"). In *State v. McKnight*, 511 N.W.2d 389, 395–96 (Iowa 1994), this court upheld a predecessor Iowa hate-crime statute to a constitutional challenge based on the First Amendment. As the court explained:

> Had McKnight limited his attack on Rone to mere words, the First Amendment would have protected his right to do so. He lost that protection when his racial bias toward blacks *drove him* to couple those words with assaultive conduct toward Rone, who is black. In these circumstances, the words and the assault are inextricably intertwined for First Amendment purposes.

*McKnight*, 511 N.W.2d at 395 (emphasis added). As *McKnight* clarifies, it is the causal connection between prejudice and a prohibited action that protects hate-crime statutes from constitutional challenge. Criminalizing

prejudice only—and therefore thoughts—would violate the First Amendment.

Hennings suggests he is in this first category: someone with socially unacceptable views whose actions were not motivated by those views. Substantial evidence supports the jury's determination that Hennings is not in this category. Hennings made racially derogatory comments both during his encounter with the boys and during his conversation with the police officers. A jury could have believed Hennings suggested the boys deserved to be run over because of their race. There was substantial evidence supporting the State's position that Hennings' bias towards the boys' race played a causal role in his actions.

The second category is the other extreme: individuals who commit a crime based on the singular motivation of the victim's protected status. Hennings' actions do not fall into this category. Crimes that fall into this category do not involve any altercation between the victim and defendant, but are instead often a seemingly random act of violence, such as an individual seeking out a person of a protected status simply because the individual wishes to harm *any* person of that protected status. There can be no question that actions with such a single discriminatory motivation are properly covered by section 729A.2. *See Mitchell,* 508 U.S. at 480, 113 S. Ct. at 2196–97, 124 L. Ed. 2d at 442 (upholding a Wisconsin hate-crime statute against constitutional challenge where defendants decided to "move on some white people" and proceeded to severely beat the first white person they encountered, a boy).

The third and intermediate category is an individual who acts based on dual intents or mixed motives. The aggressor is motivated by both the victim's protected status and by a separate motivation, for

example, by jealousy, greed, or anger. Hennings argues section 729A.2 does not apply to defendants in the third category: defendants with mixed motives. We disagree.

The legislature's use of the words "because of" in section 729A.2 requires evidence of a causal connection between the defendant's bias and the alleged actions. *See In re S.M.J.*, 556 N.W.2d 4, 6–7 (Minn. Ct. App. 1996) (holding the words "because of" require demonstration of a "causal connection"); *State v. Plowman*, 838 P.2d 558, 561 (Or. 1992) (holding the language "because of" in the state's hate-crime statute "expressly and unambiguously requires the state to prove a *causal connection* between the infliction of injury and the assailants' perception of the group to which the victim belongs").

We are frequently called upon to address causation within the criminal law. The doctrine of causation requires a "sufficient causal relationship between the defendant's conduct and a proscribed harm." *State v. Marti*, 290 N.W.2d 570, 584 (Iowa 1980). As we recently explained in *State v. Tribble*,

> When causation does surface as an issue in a criminal case, our law normally requires us to consider if the criminal act was a factual cause of the harm. The conduct of a defendant is a "factual cause of harm when the harm would not have occurred absent the conduct."

*State v. Tribble*, 790 N.W.2d 121, 126–27 (Iowa 2010) (citations omitted) (quoting Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 26, at 346 (2010) [hereinafter Restatement]). This standard of criminal causation, addressed in *Tribble* and *Marti*, has traditionally been labeled a "but for" test. *See id.* at 127; *Marti*, 290 N.W.2d at 585.

The legislature's use of the words "because of" in section 729A.2 requires that the defendant's prejudice or bias be a factual cause of the act. Under this standard, "[t]he [prejudice] of a defendant is a 'factual cause of harm when the harm would not have occurred absent the [prejudice].' " *Tribble*, 790 N.W.2d at 127 (quoting Restatement § 26, at 346). To find a causal connection, the jury need not believe the only motivation for the defendant's acts was the victim's race or other protected status. Instead, to find a defendant guilty under section 729A.2, the jury must determine beyond a reasonable doubt the defendant would not have acted absent the defendant's prejudice. Therefore, if a defendant is partially motivated by bias, but would still have committed the acts regardless of the bias, the defendant usually cannot be guilty under section 729A.2.[3]

Here, there is substantial evidence Hennings would not have run the boys down with his truck, and run over A.M., except for the boys' race. One boy testified Hennings referred to the boys as "fucking niggers" during the initial encounter. Additionally, when police officers came to Hennings' home, he referred to the boys and A.M. as "monkeys," "a normal fuckin monkey," "fuckin nigger," and "stupid monkeys." Additionally, Hennings implied the boys deserved to be hit because of their race, stating, "What . . . fuckin nigger don't have enough sense to stay out the fuckin road . . . they deserve to get hit." When asked

---

[3]The "multiple sufficient causes" doctrine is an exception to the but-for causation rule. The doctrine applies when there are "two or more competing causes, each of which is sufficient without the other to cause the harm." Restatement § 27 cmt. *a*, at 376. In such a circumstance, as we explained in *Tribble*, the Restatement and *Thompson v. Kaczinski*, 774 N.W.2d 829, 837 n.3 (Iowa 2009), have adopted a "legal rule that simply declares multiple causes that alone would have been a factual cause under the 'but for' test to be factual causes." *Tribble*, 790 N.W.2d at 127 n.2. Therefore, when two separate motivations are each independently a but-for cause of the action, each is considered a factual cause.

whether he disliked black people and why he didn't wait for the boys to move, Hennings stated, "When they're standing in fuckin road like stupid monkeys."

Hennings' own statements provided sufficient evidence for a rational jury to find beyond a reasonable doubt that Hennings acted "because of" the boys' race or color. Regardless of whether Hennings was motivated in part because the boys were in the road or because one of the boys talked back to him, the evidence supports the conclusion by a rational jury that Hennings would not have run A.M. down if he had not been African-American. This motivation is especially clear from the statements Hennings made to the police officers the day after the assault. *State v. Pollard*, 906 P.2d 976 (Wash. Ct. App. 1995), provides a similar example. In *Pollard*, the defendant was walking down the street drunk when two African-American boys playing in a yard whispered to each other and started giggling. *Pollard*, 906 P.2d at 978. Pollard entered the yard, pushed one of the boys, called him a "nigger," and threatened him. *Id.* When Pollard was arrested, he yelled the boy "should be shot, because he was black, all niggers and Mexicans should be shot." *Id.* The court upheld Pollard's conviction of a hate crime, explaining:

> Whether or not Pollard assaulted Durham in part because he was blind drunk and insulted by the boys' ridicule, the evidence is overwhelming that he also assaulted him with the intent to intimidate and harass him because of his race. As the trial court found, Pollard's reason for assaulting Durham is clear from his statements when he first noticed the boys and approached them.

*Id.* at 981–82.

One could argue both the boys' presence in the road *and* their race were but-for causes: (1) had the boys not been in the road, Hennings

would not have run down A.M.; and (2) had the boys not been African-American, Hennings would not have run down A.M. The existence of multiple factual causes does not relieve Hennings of liability under Iowa's hate-crime statute. "An actor's tortious conduct need only be *a* factual cause of the other's harm. The existence of other causes of the harm does not affect whether specified tortious conduct was a necessary condition for the harm to occur." Restatement § 26 cmt. *c*, at 347. Hennings may not have been motivated to run over the boys had they been walking on the sidewalk. However, just because the boys' presence in the street was a separate factual cause does not mean race was not also a but-for cause. As noted above, there is substantial evidence to support a jury determination that Hennings would not have run A.M. over had he been white and in the street.[4]

---

[4]The analysis of multiple factual causes is not the same as the doctrine of "multiple sufficient causes" discussed above in footnote three. Here, the jury could have found there were two but-for causes that were both necessary to Hennings' action: Hennings acted both because the boys were African-American and because the boys were in the road. In *Tribble*, this court explained that in criminal cases, the law typically requires the application of the "straightforward, factual cause requirement of causation," often labeled the " 'but for' test." *Tribble*, 790 N.W.2d at 126–27. Under a factual cause analysis, as discussed above, there may be more than one factual or but-for cause of the harm. *See* Restatement § 26 cmt. *c*, at 347. The doctrine of "multiple sufficient causes," on the other hand, addresses a situation where there are two completely independent and separate causes that each would have caused the harm independent of the other. In such a circumstance, neither is truly a but-for cause because the harm would have occurred regardless, due to the other separate and independent cause. To correct this inequality, the law declares separate independent causes to be factual causes. Restatement § 27 cmt. *a*, at 376. For this doctrine to be relevant here, both the boys' race and presence in the street would have to be separate independent causes: Hennings would have run the boys over on the sidewalk because of their race and Hennings would have run the boys over if they were Caucasian but in the street. The example of multiple sufficient causes provided in the Restatement is two campfires, each of which cause fires that converge and burn a building. *Id.* § 27 cmt. *a*, at 377. The building would have burned from either fire alone, therefore each fire is considered to be a factual cause. *Id.* The analysis is unnecessary here because, as discussed above, the jury could have found both the boys' race and presence in the street to be necessary factual causes: Hennings ran over A.M. because he was in the road *and* African-American.

Essentially, Hennings objects to the concept of hate crimes. Hennings argues it is "just as likely" he acted for nonbiased reasons and a finding that Hennings acted because of race "requires the use of speculation and conjecture." Determination of intent or mens rea is frequently an element of criminal law and our system often relies on juries to make this determination. "Because it is difficult to prove intent by direct evidence, proof of intent usually consists of circumstantial evidence and the inferences that can be drawn from that evidence." *State v. Adams*, 554 N.W.2d 686, 692 (Iowa 1996). In *Adams*, the jury was called on to determine the defendant's motivation for possessing drugs: for personal use or because he planned to deal the drugs to others. *Id.* We held a trier of fact could reasonably infer the defendant possessed the drugs with the intent to deliver. *Id.*

Likewise, juries determine whether a killing was "premeditated," a determination that requires consideration of a defendant's thoughts. In *State v. Taylor*, 310 N.W.2d 174, 178 (Iowa 1981), we upheld a jury instruction defining premeditation as "to think or ponder upon a matter before acting." Similarly, the crime of assault with intent to commit sexual abuse requires a jury to determine whether a defendant had sexual intent, even though the assault may not have been sexual in nature. *See State v. Casady*, 491 N.W.2d 782, 785–86 (Iowa 1992) (admitting prior instances of defendant pulling young women into his car and sexually assaulting them to demonstrate sexual intent when defendant attempted, but failed, to pull a girl into his car); *see also* Iowa Code § 709.11. Treason also presents a crime that requires a similar inquiry, conviction for which the United States Supreme Court has previously upheld. *Haupt v. United States*, 330 U.S. 631, 634–35, 67 S. Ct. 874, 876, 91 L. Ed. 1145, 1150 (1947) (noting that whether the

acts were done "is a separate inquiry from that as to whether the acts were done because of adherence to the enemy, for acts helpful to the enemy may nevertheless be innocent of treasonable character"). As the Court explained in *Mitchell*, a conviction for treason "may depend very much on proof of motive" to "prove that the acts in question were committed out of 'adherence to the enemy.' " *Mitchell*, 508 U.S. at 489, 113 S. Ct. at 2201, 124 L. Ed. 2d at 448.

Juries are capable of making determinations regarding intent and motivation, including whether a defendant acted "because of" a victim's protected status. There may be cases where a lack of evidence will require a directed verdict and prevent the issue from reaching the jury. To support a conviction under section 729A.2, there must be enough evidence to support a jury determination beyond a reasonable doubt that the defendant would not have acted in the absence of the victim's protected status. That level of evidence is present here.

**B. Sentencing.** The district court sentenced Hennings to an indeterminate term not to exceed five years for both counts II and III and ordered the sentences to run consecutively. Hennings argues the district court's order that the sentences run consecutively should be set aside because the court failed to state on the record its reasons for selecting that the sentences run consecutively. The State concedes and suggests the district court did not explain why it was sentencing Hennings to consecutive sentences. The State requests we vacate Hennings' sentences and remand the case for resentencing to allow the district court to state its reasons on the record. We, however, are not bound by the State's concession. *See State v. Bergmann,* 633 N.W.2d 328, 332 (Iowa 2001) ("Although the State concedes that error has been preserved on every issue raised on appeal by filing the timely suppression motion,

we disagree."); *State v. Epps*, 313 N.W.2d 553, 557 (Iowa 1981) ("Although the State concedes this testimony by Bolden exceeded the scope of the minutes, we do not agree.").

According to Iowa Rule of Criminal Procedure 2.23(3)(*d*): "The court shall state on the record its reason for selecting the particular sentence." "A statement may be sufficient, even if terse and succinct, so long as the brevity of the court's statement does not prevent review of the exercise of the trial court's sentencing discretion." *State v. Johnson*, 445 N.W.2d 337, 343 (Iowa 1989).

At the sentencing hearing, the district court first explained the sentencing options, noting the difference between a sentence of confinement, probation, and a deferred sentence. The judge explained the hate-crime conviction carried a mandatory sentence and therefore, probation or a deferred sentence were not options.

The judge then summarized what he had reviewed, noting:

> I look at your age, that's what the Presentence Investigation Report contains along with your prior criminal record, your employment record, your education record, previous crimes that you have been charged with, and of course, it gives some recommendation, usually in a Presentence Investigation Report and this one does the same thing, so I've had a chance to review that. I, of course, presided at the trial, so I heard all the testimony that was presented in this case.

The district court explained the specific factors that influenced its sentencing decision. The court noted the purpose of sentencing is to protect society and also a hope of rehabilitation. The district court emphasized the crime was classified as a hate crime and stated that based on the evidence at trial, he believed it would have been difficult for the jury not to convict on the hate crime. The district court also noted that by enacting hate-crime legislation, the legislature wanted to send a

message that "we're [not] going to have any kind of violent activity based solely upon a person's race." The district court specifically referenced A.M.'s mother's testimony, in which she was angry and felt Hennings could have chosen not to run over A.M.

The district court then stated, "with all those things in mind," each of the sentences for counts II and III would be a period of not more than five years and stated: "These two sentences shall run consecutively."

Hennings and the State apparently believe the district court's explanation was insufficient as it pertained to the choice to run the sentences consecutively. We disagree. The court spoke at length about the information it considered in making a sentencing determination and specifically, what factors influenced its ultimate decision. This is not a situation where the court "failed to give even a terse explanation of why it imposed consecutive, as opposed to concurrent, sentences." *State v. Uthe*, 542 N.W.2d 810, 816 (Iowa 1996). Nor is it a situation where the court " 'did not state *any reason* why the two mandatory sentences were set to run consecutively' " or "left the impression that the trial court may have mistakenly believed that consecutive sentences were mandatory." *Johnson*, 445 N.W.2d at 343 (quoting *State v. Harrington*, 349 N.W.2d 758, 763 (Iowa 1984), *abrogated on other grounds by Ryan v. Arneson*, 422 N.W.2d 491, 495 (Iowa 1988)). Instead, "[i]t is apparent to us that the district court ordered the defendant to serve his sentences consecutively as part of an overall sentencing plan." *Id.*

## IV. Conclusion.

Substantial evidence supports the jury determination that Hennings acted because of his victim's race, as required by Iowa's hate-crime statute. Additionally, the district court provided a sufficient

statement on the record regarding the reasons behind the decision to sentence Hennings to consecutive sentences.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except Appel, Wiggins, and Baker, JJ., who concur specially.

**APPEL, Justice (concurring specially).**

I agree with the result in the majority opinion and much of the analysis contained in it. I write separately only to emphasize the narrowness of today's ruling.

The sole issue raised in this case is whether there is substantial evidence to support the verdict. On this narrow issue, there is authority in some jurisdictions that the use of a racial epithet in the heat of a fight or altercation, standing alone, may be insufficient to support a conviction of a hate crime. *See Commonwealth v. Ferino*, 640 A.2d 934, 938 (Pa. Super. Ct. 1994).

In this case, there was substantial evidence that Hennings uttered a racial epithet at the conclusion of the initial encounter. But that was not the end of the matter. Instead of leaving, there was substantial evidence that Hennings returned to the scene and began using his vehicle to chase down an African-American youth.

Why did Hennings engage in this odd behavior when he had already begun to withdraw from the scene? In explaining his behavior to police who were investigating the incident, Hennings, after repeatedly using racially derogatory terms to describe the boys, declared "What . . . fuckin nigger don't have enough sense to stay out the fuckin road . . . they deserve to get hit." These were not angry words made in the course of a heated struggle, an isolated or stray comment reflecting the anger of the moment, or even simply a strident declaration of philosophy or belief. Hennings made these statements after passions had cooled to investigating officers trying to determine, among other things, why Hennings did not simply break off the encounter. Hennings, apparently, found repeated pejorative racial reference to the youth as relevant to

explain his odd behavior that night, and so did the jury. On this record, I am satisfied that there is sufficient evidence to support the conviction of a hate crime.

I observe, however, that courts must take care to ensure that a defendant is not convicted of a hate crime merely because a defendant holds unorthodox or unpopular beliefs. In a hate-crimes case, the trial judge must carefully control the admission of evidence and ensure that the jury is properly instructed on the law. Where convictions result, courts must carefully review the record to ensure that the jury has not convicted the defendant of a hate crime based merely upon his or her unsavory views.

Wiggins and Baker, JJ., join this special concurrence.