**IN THE COURT OF APPEALS OF IOWA**

No. 13-1058
Filed August 13, 2014

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JUSTIN DONALD HUFFMAN,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Glenn E. Pille, Judge.


        Defendant appeals his conviction and sentence for theft in the second degree. **AFFIRMED.**



        Van M. Plum of Plum Law Firm, Des Moines, for appellant.

        Thomas J. Miller, Attorney General, Alexandra Link, Assistant Attorney General, John P. Sarcone, County Attorney, and Brendan Greiner, Assistant County Attorney, for appellee.


        Considered by Danilson, C.J., and Vogel and Bower, JJ.

**DANILSON, C.J.**

Justin Huffman appeals his conviction and sentence for theft in the second degree, pursuant to Iowa Code sections 714.1(1) and 714.2(2) (2011). Huffman maintains there was insufficient evidence to support the guilty verdict. He also maintains the district court erred by accepting inconsistent verdicts. Because we find substantial evidence supports Huffman's conviction and the verdicts were not legally inconsistent, we affirm.

**I. Background Facts and Proceedings.**

On January 17, 2013, the State charged Huffman by trial information. He was charged with forgery, in violation of Iowa Code section 715A.2(1)(a)(3), and theft in the second degree, in violation of Iowa Code sections 714.1(1) and 714.2(2). The matter proceeded to jury trial on March 25, 2013.

It is undisputed that Huffman arrived at the Pleasant Hill branch of Valley Bank on November 22, 2012, seeking to cash a money order that was made out for $870. The teller informed Huffman he needed a checking account with the bank in order to cash the money order. Huffman agreed to open one, and the teller cashed the order—giving Huffman $400 in cash at the time and placing the other $475 on hold in the checking account. The teller retained the $475 as a safeguard because the phone number used by bank employees to verify money orders was not working at the time Huffman came into the branch. Before leaving at approximately noon, Huffman asked for the location of other branches. The teller gave him a brochure listing the locations and hours of operation for each of the other branches. The teller believed Huffman was nervous, noting he

was "moving back and forth going outside a couple times, going to the bathroom, not staying still."

The same day, Huffman called the Altoona branch to ask about its location. About an hour after the call, at approximately 3:00 p.m., Huffman arrived at the branch and presented a second money order for $870 to be cashed. The teller cashed the money order and gave Huffman the full amount. The teller testified he did not see anything wrong with the money order at the time he cashed it, but within a few minutes of Huffman leaving, he noticed the watermark was suspicious. He called the Ankeny branch and obtained the phone number to verify money orders. He then called the number and discovered the money order was counterfeit.

Retail manager Barbara Agena was present at the Ankeny branch when Huffman arrived a few minutes before closing time on November 22, 2012. Huffman presented a third money order made out for $870. Agena, who had talked to the other branch managers during the day and knew about the previous counterfeit money orders, told Huffman the bank would not cash his third money order because she thought it was fake. Huffman told her he received the money order from his boss and that it was "good." Agena offered to deposit the funds into his checking account with a ten-day hold so that it could be determined whether the money order was counterfeit. Huffman declined and instead asked to close his checking account and remove the $470 placed in it earlier in the day. Agena told him he could not do that because she did not believe "the money was

any good." Huffman then left with the third, uncashed money order. He did not return any of the funds he received from the first two money orders.

The State called Nancy Harms-Werner, a United States postal inspector, to testify about the authenticity of the money orders. Sometime after November 22, 2012, she had the opportunity to study both money orders Valley Bank cashed for Huffman. At trial, she testified they were counterfeit. On cross-examination, Huffman questioned whether she had any knowledge of an internet scam involving mystery shoppers. Harms-Werner testified she was aware of an internet scam where a person producing counterfeit money orders contacts a third party and offers to pay them to complete a job as a mystery or secret shopper. The person producing the money orders sends the money order as payment and then asks the third party to cash it and wire some excess amount back to them. Huffman further questioned whether it was possible for law-abiding citizens to fall for such a scam. After she answered that it was, Huffman asked Harms-Werner how she distinguishes between those who have been tricked and those who have tried to cash money orders they knew to be fraudulent. Harms-Werner then explained various factors she considers in her investigations, such as a whether a person tried to have the money order verified and the circumstances surrounding how the money order was presented to be cashed.

Mary Corley, the sole witness for the defense, testified she had applied for a job online to be a secret shopper. She expected to do surveys regarding customer service and quality of products. She received an email stating she

had been hired and was told to expect more information in the mail. She was mailed four money orders along with instructions to cash them at her bank of choice. She cashed all four of them at one time at her bank and then wired the excess money to the address in the Philippines she had been provided. After she did this the first time, she was sent another package of money orders that amounted to $4500. The amount was so large she had to go to two different Western Unions to wire the funds to the same address in the Philippines. Sometime after she transferred the $4500, she tried to take money out of her bank account and realized she had a negative balance. After speaking with her bank, she learned the money orders she had cashed were counterfeit. She then contacted Western Union, the police, and the postal service, as well as the fraud department of her bank.

Following the conclusion of testimony, the jury returned a guilty verdict for theft in the second degree but acquitted Huffman of the forgery charge. Huffman stipulated that he was a habitual offender, pursuant to Iowa Code section 902.8. The court sentenced Huffman for a term not to exceed fifteen years, but suspended the sentence and placed him on supervised probation for a period of five years. Huffman appeals.

**II. Standard of Review.**

We review challenges to the sufficiency of evidence for errors at law. *State v. Sanford,* 814 N.W.2d 611, 615 (Iowa 2012). We review the evidence "in the light most favorable to the State, including all reasonable inferences that may be deduced from" it to determine whether the finding of guilt is supported by

substantial evidence and should be upheld. *Id.* Evidence is substantial if it would convince a rational fact-finder of the defendant's guilt beyond a reasonable doubt. *Id.*

"The consequence of a potentially inconsistent jury verdict is a question of law, and accordingly, our review is de novo." *State v. Merrett*, 842 N.W.2d 266, 272–73 (Iowa 2014).

## III. Discussion.

### A. Sufficiency of Evidence.

Huffman maintains the State failed to present sufficient evidence to support the specific intent element of his conviction for second-degree theft[1] and the court erred in denying his motion for acquittal. He claims that while it is undisputed he cashed counterfeit money orders, there is not sufficient evidence to support the finding he intended to deprive Valley Bank of its money.

Determination of intent or mens rea is frequently an element of criminal law, and our system often relies on juries to make this determination. *State v. Hennings*, 791 N.W.2d 828, 837 (Iowa 2010). "Because it is difficult to prove intent by direct evidence, proof of intent usually consists of circumstantial

---

[1] The court instructed the jury:
> [T]he State must prove all of the following elements of Theft:
> (1) On or about November 23, 2012, the defendant took possession or control of money from Valley Bank.
> (2) The defendant did so with the intent to deprive Valley Bank of the money.
> (3) The money, at the time of the taking, belonged to Valley Bank.
> If the State has proved all of the elements, the defendant is guilty. You must then determine the degree of Theft, as explained to you in Instruction No. 18. If the State has failed to prove any one of the elements, the defendant is not guilty.

evidence and the inferences that can be drawn from that evidence." *Id.* "[C]ircumstantial evidence is just as probative as direct." *State v. Poyner*, 306 N.W.2d 716, 718 (Iowa 1981). "A [defendant] will generally not admit later to having the intention which the crime requires . . . his thoughts must be gathered from his words (if any) and actions in light of surrounding circumstances." *State v. Radeke*, 444 N.W.2d 476, 478–79 (Iowa 1989). The jury is free to credit certain evidence and reject other. *State v. Nitcher*, 720 N.W.2d 547, 556 (Iowa 2006).

We conclude a rational jury could infer Huffman had a specific intent to deprive Valley Bank of its money. Although Huffman attempted to imply he had inadvertently participated in an internet scam involving counterfeit money orders, the jury was free to disbelieve his version of the events in considering the evidence of the case. *See State v. Miller*, 535 N.W.2d 144, 148 (Iowa Ct. App. 1995). The first teller testified Huffman appeared to be nervous while opening a checking account and cashing the first money order. He also testified Huffman had asked about the location of other branches before leaving. Approximately two hours after leaving the first branch, Huffman called the second branch to get directions to its location. He arrived an hour later and cashed the second money order. Less than three hours later, and only a few minutes before closing time, Huffman arrived at the third branch to cash the final money order. There, Agena informed Huffman she had doubts about the authenticity of the money orders. He refused to deposit the third money order with a ten-day hold so the bank could verify the authenticity. Although Huffman was advised the bank believed

the money orders he had cashed earlier were counterfeit, he did not return any of the money he had obtained earlier in the day. Instead, he tried to obtain the rest of the money from his account and close it.

Based on our review of the evidence in the record, we conclude the district court properly denied Huffman's motion for judgment of acquittal because substantial evidence supports his conviction for theft in the second degree.

**B. Inconsistent Verdicts.**

Huffman contends his conviction for theft in the second degree was inconsistent with the jury's decision to acquit him of forgery. He maintains that forgery was a predicate offense for the theft charge, and because he was acquitted of the predicate offense, his conviction for theft cannot stand. *See State v. Halstead*, 791 N.W.2d 805, 814 (Iowa 2010) ("[W]hen the defendant is acquitted of the underlying predicate crime, the conviction cannot stand.").

As our supreme court has recognized, a verdict can be either factually inconsistent or legally inconsistent. *See id.* at 807.

> For example, in a vehicular manslaughter case, the conviction of a defendant for the death of one passenger in the car but acquittal on a charge related to another passenger is "factually inconsistent." There is no legal flaw in the jury's verdict, but the verdicts seem inconsistent with the facts. On the other hand, the conviction of a defendant of a compound crime when he or she is acquitted on all predicate offenses is said to be "legally inconsistent." In these cases, the jury verdict is inconsistent as a matter of law because it is impossible to convict a defendant of the compound crime without also convicting the defendant of the predicate offense.

*Id.* (internal citations omitted).

Here, the forgery charge was not an underlying predicate offense for the theft charge. Unlike in *Halstead*, the jury instructions did not specifically state the

forgery charge was a predicate offense for the theft charge.[2]  *See* 791 N.W.2d at 816 n.4.  The offenses are distinct, even though there is some overlap of the elements.[3]  We acknowledge the jury verdicts in this case could be viewed as factually inconsistent.  However, they are not legally inconsistent.  Because our case law prohibits only legally inconsistent verdicts, Huffman's conviction for theft is not invalid.  *See id.* at 815 ("[W]e do not open a Pandora's box by probing into the sanctity of jury deliberations.  Our analysis focuses solely on the legal impossibility of convicting a defendant of a compound crime while at the same time acquitting the defendant of predicate crimes.").

Because we find substantial evidence supports Huffman's conviction for theft and the jury's verdicts were not legally inconsistent, we affirm.

**AFFIRMED.**

---

[2] To convict Huffman of forgery, the jury had to find: "(1) On or about November 23, 2012, the Defendant uttered a money order that the Defendant knew had been created without the permission of the United States Postal Service. (2) The Defendant specifically intended to defraud or injure Valley Bank."

[3] For example, the jury could have concluded that Huffman knew he had no right to the bank's money, an element of theft, but did not know the money order was created without the permission of the U.S. Postal Service, an element of forgery.