# IN THE COURT OF APPEALS OF IOWA

No. 15-0568
Filed June 15, 2016

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**NATHANIEL QUENTIN KNIGHT,**
        Defendant-Appellant.

_____

Appeal from the Iowa District Court for Black Hawk County, Kellyann M. Lekar, Judge.

Nathaniel Knight appeals his conviction and sentence for child endangerment resulting in death. **AFFIRMED.**

Aaron D. Hamrock of McCarthy & Hamrock, P.C., West Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Aaron J. Rogers, Linda J. Hines, and Katherine M. Krickbaum (until her withdrawal), Assistant Attorneys General, for appellee.

Heard by Potterfield, P.J., and Mullins and McDonald, JJ.

**MULLINS, Judge.**

Nathaniel Knight appeals his conviction and sentence for child endangerment resulting in death in violation of Iowa Code section 726.6(4) (2013), contending (1) the court erred in denying his motion for judgment of acquittal because there was insufficient evidence he acted knowingly, intentionally, or willfully; (2) his counsel was ineffective for failing to object to the jury instructions containing the knowing, intentional, and willful elements; and (3) his counsel was ineffective for failing to request a proximate-causation instruction. We affirm.

## I.  Background Facts and Proceedings

On March 12, 2013, Deonjanae Dixon left her two-year-old child, K.P., in the charge of Knight, her friend and former colleague. At that time, Knight was living with Dixon and K.P. and had been for approximately two months. In exchange for a place to stay, Knight provided child care for K.P. while Dixon was at work. On the day in question, Knight drove Dixon to work for her shift—from 2 p.m. to 10 p.m. Knight brought K.P. along, dressed in a coat and hat, because the temperature outside was in the 20s with wind chills in the single digits. K.P. appeared happy and healthy.

After driving Dixon to work, Knight ran a couple errands, taking K.P. with him. After running his errands, around 3 p.m., Knight returned to Dixon's place of employment to drop off some tea he had purchased for Dixon at her request. Dixon's coworker collected the tea and observed that K.P. appeared in good health at that time. Knight then drove K.P. back to Dixon's home.

Approximately four hours later, at 7:21 p.m., Knight called 911 and reported K.P. was no longer breathing. Knight indicated to the dispatcher he was unaware how long K.P. had not been breathing and that the child was "not turning colors yet" but was "starting to get chilly." When asked, Knight confirmed he found K.P. not breathing while the child had been taking a nap. He indicated to a second dispatcher he was a licensed practical nurse (LPN) and, after finding K.P. unresponsive, had removed her from her bed, placed her on the floor, and initiated CPR. Knight estimated K.P. had been alone for fifteen minutes before he had found her not breathing. Knight stated he was still performing CPR and had detected a faint pulse.

When first-responding officer Troy Wilson arrived, he found Knight and K.P. upstairs in K.P.'s bedroom. Wilson was unable to find a pulse. Knight stated he had been performing CPR and resumed chest compressions. Wilson observed the floor around K.P. was wet but the child was dry. At trial, Wilson testified Knight was "calm" and "didn't seem excited." Wilson found Knight's calm and unexcited demeanor "unusual."

When the paramedics arrived, Wilson asked Knight to step into the hallway so they could talk. Wilson asked Knight what had happened. Knight told Wilson he had been babysitting K.P. since 2 p.m., gave her a bath shortly before 7 p.m., and then put her down to bed because she had been fussy and acting tired. Knight indicated he checked on K.P. fifteen minutes later and found her not breathing or moving.

Police Officer Brice Lippert also responded to the Dixon residence. When heading to K.P.'s room, Officer Lippert passed Knight and believed Knight to be a

paramedic because of his calm demeanor and the stethoscope Knight had draped around his neck. Officer Lippert testified Knight was not panicked, crying, upset, or even concerned, which, based on his experience, he found to be an atypical response for this type of situation. Having stopped by K.P.'s room, Officer Lippert went to speak with Knight. He found Knight "sitting in the middle of the couch, leaning back with his hands behind his head. . . . just casually sitting there." When questioned, Knight admitted K.P. was in his sole care and that "he had given [K.P.] a bath, everything was going to be okay, and he put [K.P.] into bed." Knight said he went to check on K.P., was unable to awake her, shook her, and then saw she had thrown up.

The paramedics were unable to find K.P.'s pulse and continued CPR. One medical officer testified K.P. was dressed in pajamas and dry, but the floor around her was wet and her skin was considerably colder than the temperature of the room. A lieutenant for the Waterloo Fire Department, who assisted with the administration of CPR, testified K.P. was "cool, cold to the touch, much more so than . . . expected for being down for 10 to 15 minutes." The lieutenant further noted it struck him as odd that K.P.'s core temperature—the chest and back— was cold in addition to K.P.'s limbs, when he would have expected her core to have retained heat. The lieutenant observed that K.P. was dressed and dry, but the floor was wet. The temperature of the house, however, was approximately 68 degrees, and multiple responders testified the temperature inside was comfortable.

Around 7:30 p.m., K.P. was transported to the hospital. The responding physicians immediately noted how cold K.P. was and attempted to warm her core

body temperature, which was 77 degrees—approximately 22 degrees below normal. Despite K.P.'s cold temperature, there were no signs of rigor mortis. At approximately 11:30 p.m., K.P. was pronounced dead; the probable cause of death was hypothermia.

That same night, officers searched Dixon's home. One officer testified that, in addition to the wet spot in K.P.'s room, there was a second pool of what appeared to be water in the dining room, though there was no indication of the source of the water in either room. The same officer observed two bathroom rugs had been placed on the sink in an upstairs bathroom and there was water around the edge of the bathtub and on the faucet, leading the officer to believe the tub recently had been used. The officers found feces throughout the house— smeared into the carpet in the upstairs landing and in the upstairs bathtub, on a wet mop in the upstairs bathroom, and smeared down the front of a pair of men's jeans found in the room where Knight was keeping his possessions. In a later search, officers found a t-shirt covered in feces in the same room where they had found the jeans.

In addition to the house, the officers searched an unheated porch on the front of the house. The door to this porch, in addition to the back door, had child-safety locks, as K.P. had previously opened the door leading to the unheated porch before placement of the locks. At trial, an officer testified these locks were working properly, and Dixon testified she had not seen K.P. open the door to the porch since the safety devices had been installed. On the front porch, the officers found a box containing paper towels with fecal matter on them. The

bottom of the box was soaked with what appeared to be urine. Feces was also found on the bottom of K.P.'s feet.

Knight was subsequently interviewed at the Waterloo Police Station. During the course of questioning, Knight's responses evolved. At first, Knight told the officers K.P. had been watching a television show in her room; he gave her a bath around five, during which time he worked on a toilet seat; he took K.P. out of the bath, got her dressed, and put her in bed to watch cartoons. Knight said he then cleaned up the bathroom, put the groceries away, came upstairs to take a shower, and realized he should feed K.P. When he went to check on K.P., approximately twenty to thirty minutes after putting the child down, she was unresponsive with vomit in the corner of the mouth, which Knight indicated got on the floor when he put K.P. down to perform CPR. When asked, Knight indicated he was wearing the same clothes during the incident as he was in the interview.

Subsequently, Knight adjusted the time frame, saying K.P.'s bath had occurred at 4:30 p.m. and that she had been alone in the room for forty-five to fifty minutes, and changed his activities from starting dinner and putting away groceries to petting the cat, going to the bathroom, wandering around, and getting on social media websites on his phone. During the interview, Officer Lippert mentioned K.P.'s body temperature was low; Knight indicated he did not know why. When discussing the doctor's attempts to warm K.P.'s core temperature, Knight stated, "[I]t didn't matter because [K.P.'s] brain was going to be toast."

Officer Lippert then asked Knight about the feces found on K.P.'s feet. Knight, for the first time, informed the officer K.P. had "pooped in the tub." He

indicated he had not washed K.P. himself, had not done a good job of drying her, and had put her in dirty clothes after the bath—including blue socks, which must have kept the feces on her feet.  Knight also indicated he had, in fact, changed his clothes after K.P. defecated in the tub and had used his jeans to clean up the mess.  Knight also admitted that K.P. defecating in the tub made him upset. When Officer Lippert asked Knight about the water in the dining room, Knight indicated the water may have overflown from the tub due to K.P. splashing, which would then seep downstairs into the dining room.

At trial, Dixon testified K.P. had been potty-trained since she was fifteen-months old and that, except for occasionally wetting the bed, K.P. never defecated around the house or in her pants.  She further testified she had never asked Knight to bathe K.P. nor had he ever assisted with baths.  Dixon further testified that, during the night in question, Dixon called Knight eight times from 4:30 p.m. to 7:17 p.m. and Knight failed to answer any of these calls.  With regard to the box on the front porch, Dixon testified the box itself had previously been there but its contents had not, nor had there ever been a puddle of water in the dining room, as the dining room is under a bedroom and not the bathroom. Dixon stated she had not seen feces around the house or the rugs in the sink before heading to work, nor did she keep the mop in a "dirty condition."

At trial, Officer Lippert testified the television show Knight said K.P. had been watching did not air at the time Knight indicated K.P. watched it; the television had not been on in K.P.'s room when he arrived; a pair of blue socks had been recovered in K.P.'s room but there was no feces on them; and Knight's

story that water from the upstairs bath caused the wet spot in the dining room did not "make any sense."

Numerous parties testified no indication of vomit was found, although an officer indicated a part of K.P.'s bedspread was "crusty" but was otherwise unable to describe it, and Officer Lippert testified it was not vomit, blood, or feces. Further, there was no evidence Knight had begun cooking dinner. Several witnesses—including the state medical examiner, a treating emergency room physician, and Resmiye Oral, a professor of pediatrics and Director of the Child Protection Program at the University of Iowa—also testified K.P.'s condition was not consistent with Knight's rendition of events and timeline.

The state medical examiner testified, "[I]t would have been impossible for her temperature to have decreased that rapidly . . . . [S]he[] had to [have] be[en] exposed in some way to cold, cold water. Something else happened." She indicated it would take approximately ten hours after death, in a normally heated room, for a child's body to have cooled to K.P.'s temperature. At the conclusion of the autopsy, the medical examiner determined K.P. likely died of hypothermia, resulting from "some type of exposure." She stated this type of physical condition could result from exposure to the elements if sufficiently cold, exposure to cold water, or from being placed in a refrigerator. She opined it was possible, depending upon the time frame, that being left on a cold porch for an extended period of time could result in the core temperature drop seen in K.P. While noting that a person experiencing hypothermia may be affected to the point where they feel no pain, the medical examiner concluded "being put into cold water would be painful or being exposed to touching something cold is painful."

When asked how K.P.'s body temperature could have become so low, one treating emergency room physician testified "the only . . . thing I can think of would be being exposed to cold environment" and that it would have taken no less than an hour to do so.

Dr. Oral testified that, based on the fact K.P.'s heart was still beating while her temperature was so low, K.P. died of hypothermia. She opined that to reach such a cold temperature could have taken a half hour or an hour but it would not have occurred from "just [a] couple of minutes of accidental exposure." Dr. Oral further opined the uniformity of the decreased temperature of K.P.'s body indicates she was not wearing clothes when exposed to the cold temperature. Dr. Oral testified K.P. would have felt pain from the cold, especially in her extremities, would have cried for help, and that a child of K.P.'s age requires constant monitoring and cannot be alone for an hour or more at a time. Dr. Oral indicated a common trigger for acts of child abuse include toilet-training accidents, such as stooling or urinating. She further testified that, in her extensive experience, parents tell consistent stories when the injuries sustained by a child are accidental; she then indicated Knight's story was not consistent with K.P.'s condition. Dr. Oral concluded K.P.'s condition could have resulted from being placed on the unheated porch for a period of time.

Knight was charged with child endangerment resulting in death in violation of Iowa Code section 726.6(4). A jury trial commenced on February 3, 2015. At the close of the case, Knight's trial counsel moved for a directed verdict, which the court treated as a motion for judgment of acquittal and denied. On February 9, 2015, the jury found Knight guilty.

## II. Scope and Standard of Review

> The principles governing our review of a district court's denial of a criminal defendant's motion for judgment of acquittal are well-established. *State v. Henderson*, 696 N.W.2d 5, 7 (Iowa 2005). A motion for judgment of acquittal is a means of challenging the sufficiency of the evidence, and we review such claims for correction of errors at law. *Id.* A guilty verdict must be supported by substantial evidence. *Id.*

*State v. Serrato*, 787 N.W.2d 462, 465 (Iowa 2010). "'Substantial evidence' is that upon which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *Id.* (quoting *State v. Hagedorn*, 679 N.W.2d 666, 668-69 (Iowa 2004)). In making this determination, we "view the 'evidence in the light most favorable to the State, including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *Id.* (quoting *State v. Quinn*, 691 N.W.2d 403, 407 (Iowa 2005)).

In order to prove an ineffective-assistance-of-counsel claim, an appellant must show by a preponderance of the evidence that counsel (1) failed to perform an essential duty and (2) prejudice resulted. *Ennenga v. State*, 812 N.W.2d 696, 701 (Iowa 2012). We can resolve ineffective-assistance claims under either prong. *State v. Ambrose*, 861 N.W.2d 550, 556 (Iowa 2015). We review ineffective-assistance claims de novo. *State v. Finney*, 834 N.W.2d 46, 49 (Iowa 2013). While ineffective-assistance-of-counsel claims are generally preserved for postconviction relief actions, we will address them on direct appeal where the record is sufficient to permit ruling. *See State v. Null*, 836 N.W.2d 41, 48 (Iowa 2013).

**III. Analysis**

On direct appeal, Knight challenges the trial court's denial of his motion for judgment of acquittal, alleging the State failed to prove his acts were either willful, intentional, or knowing. He further claims his trial counsel was ineffective. We address each claim below.

**A. Substantial Evidence**

The marshalling instruction given to the jury provided as follows:

> To prove Nathaniel Knight guilty of Child Endangerment Resulting in Death, the State must prove all of the elements for Child Endangerment Resulting in Death:
> 1. On or about the 12th day of March, 2013, the Defendant was the person having custody or control of [K.P.].
> 2. [K.P.] was under the age of fourteen years.
> 3A. The Defendant acted with knowledge that he was creating a substantial risk to [K.P.]'s health and safety.
> Or
> 3B. The Defendant intentionally committed an act or series of acts or used unreasonable force, torture or cruelty that resulted in physical injury to [K.P.] or with the specific intent to cause serious injury to [K.P.].
> Or
> 3C. The Defendant willfully deprived [K.P.] of necessary shelter or supervision appropriate to the child's age when the Defendant was reasonably able to make the necessary provisions in which the deprivation substantially harmed [K.P.]'s health.
> 4. The Defendant's acts resulted in death to [K.P.].
> If the State has proved all of the elements, the Defendant is guilty of Child Endangerment Resulting in Death. If the State has failed to prove any one of the elements, the Defendant is not guilty of Child Endangerment Resulting in Death and you will then consider [a lesser-included offense].

Knight does not dispute the first two elements. Instead, Knight argues the State failed to prove his actions or inactions were knowing, intentional, or willful. These necessary elements were also defined by jury instruction.

Knowing was defined as follows: "For the Defendant to know or have knowledge of something means he had a conscious awareness of it."

Specific intent was defined to mean "not only being aware of doing an act and doing it voluntarily, but in addition, doing it with a specific purpose in mind." The jury instruction explained, "Because determining the Defendant's specific intent requires [the jury] to decide what [the defendant] was thinking when an act was done, it is seldom capable of direct proof." Accordingly, the jury was instructed it "should consider the facts and circumstances surrounding the act to determine the Defendant's specific intent. [The jury] may, but [is] not required to, conclude a person intends the natural results of his acts." Finally, the instruction provided, "Specific intent does not have to exist for any particular length of time. It is sufficient if it exists any time before the act."

Willful was defined to mean "intentional or by fixed design or purpose and not accidental."

Knight does not challenge the definitions themselves but rather that they are not supported by substantial evidence.

The evidence shows—and Knight admitted—that K.P. had a stooling accident, which made him angry. Feces was found in the bathroom where K.P. was allegedly bathed, on the bottom of K.P.'s foot, and on paper in a box on the unheated porch. Access to this unheated porch was restricted by a child-safety lock. There was no evidence presented at trial that K.P. had any ability to override the child-safety lock.[1] Expert testimony supported a finding that K.P.

---

[1] Knight claims K.P. may have been able to override the child-safety lock, noting a police officer was able to do so. Of course, the purpose of a child-safety lock is to limit access

died of hypothermia, that this process could have taken thirty minutes to an hour, and that K.P. would have been experiencing pain, which would have caused her to cry for help. Expert testimony further supported that the consistent cooling of K.P.'s body indicated she may have been on the porch without any clothing. The evidence established the responding emergency personnel found Knight's demeanor to be oddly calm and unexcited. *See State v. Hythecker*, No. 01-1048, 2002 WL 987966, at *3 (Iowa Ct. App. May 15, 2002) ("A defendant's demeanor and activities immediately following an alleged offense provide a legitimate basis for inferring consciousness of guilt."). Further, Knight represented himself as being an LPN with training in health care. When questioned about the events of the evening, Knight repeatedly changed his story, often prompted when new facts were introduced by the officers. *See id.* (finding "conflicting statements were additional evidence from which the jurors could infer guilt"); *see also State v. Adams*, No. 13-1852, 2015 WL 799542, at *1 (Iowa Ct. App. Feb. 25, 2015); *State v. Smith*, No. 07-1406, 2008 WL 3916768, at *4 (Iowa Ct. App. Aug. 27, 2008). When informed of Knight's version of events, the medical experts found Knight's story inconsistent with K.P.'s condition.[2] *See Smith*, 2008 WL 3916768, at *4 (noting, when considering a challenge to the sufficiency of the evidence, that "[i]n addition to all of the discrepancies in [the defendant's] explanations of how the injuries occurred, many of the medical experts who treated [the child]

for children—not adults. There was no testimony K.P. could override the locks; Knight's argument is speculation at best.

[2] Knight argues that, though inconsistent statements may provide a basis to infer guilt, *see State v. Blair*, 347 N.W.2d 416, 422 (Iowa 1984) ("We have said that a defendant's inconsistent statements are probative circumstantial evidence from which the jury may infer guilt."), they do not demonstrate the requisite mens rea. Knight claims the inference must be "elevated by additional evidence." As outlined above, there is ample additional evidence to support the jury's finding.

testified they believed [the defendant's] explanations to be inconsistent with the nature and extent of the injuries"). One expert also opined a child of K.P.'s age requires some measure of constant monitoring.

Taking the evidence in the light most favorable to the State, and allowing all reasonable inferences, substantial evidence supports a jury finding that Knight knowingly—with conscious awareness his acts would create a substantial risk to K.P.—or intentionally—with specific purpose—placed and left K.P. on an unheated porch in subfreezing temperatures, which resulted in K.P.'s death. There is also substantial evidence Knight willfully[3] deprived K.P. of necessary shelter and supervision—either by placing her on the porch or ignoring that K.P. had let herself onto the porch[4]—and that this willful deprivation resulted in K.P.'s death.

---

[3] Knight specifically challenges the willful element, alleging there is no evidence K.P. was neglected for an extended period of time, there was no deprivation of medical attention, and there was no evidence Knight failed to supervise K.P. as it is unreasonable to expect an adult to monitor a child every minute the child is sleeping. As noted by Knight, there is no "temporal requirement for the length of time a person must willfully deprive a child" of shelter and supervision. *See State v. Leckington*, 713 N.W.2d 208, 215 (Iowa 2006). Here, medical experts opined it might have taken thirty minutes to an hour for K.P.'s temperature to have dropped as low as it did—during which time K.P. would have felt pain and cried for help. Again, there were child-safety locks on the doors and no evidence K.P. could override them. To the contrary, K.P. had previously been able to open the doors—prompting her mother to get the child-safety locks—and no account this had been repeated since the security measure had been added. This supports a finding that Knight not only deprived K.P. of necessary shelter and supervision by failing to respond to K.P.'s cries for help but proactively removed her from the shelter and supervision she desperately needed.

[4] Knight also argues there is no evidence he heard K.P.'s screams. The testimony given indicated K.P. would have been in pain, she would have been crying for help, and she was likely on the porch—in this condition—for over thirty minutes. "[I]nferences and presumptions are a staple of our adversary system of fact-finding." *State v. Schmidt*, 588 N.W.2d 416, 418 (Iowa 1998) (citation omitted). "The jury or fact finder may consider all of the evidence and derive any reasonable inferences therefrom." *Id.* Based on the evidence, the jury could have reasonably inferred K.P.'s cries on the front porch would have been heard.

## B. Ineffective Assistance of Counsel

### 1. Causation Jury Instruction

Knight argues his "action or inaction directly causing the death of K.P. is the sole issue in this case." Thus, "[f]ailure to request an instruction that would require the jury to find that Mr. Knight's actions proximately resulted in K.P.'s death is failure to provide an essential duty."[5] As a preliminary matter, causation is not the "sole issue" in this case. As established by Knight's own argument, the primary dispute on appeal is whether the State proved Knight had the requisite mens rea. That said, we address the merits of his contention.

"Generally, causation exists in criminal law, often without much fanfare, as a doctrine justifying the imposition of criminal responsibility by requiring a 'sufficient causal relationship between the defendant's conduct and the proscribed harm.'" *State v. Tribble*, 790 N.W.2d 121, 126 (Iowa 2010) (citation omitted); *see also State v. Hennings*, 791 N.W.2d 828, 835 (Iowa 2010), *overruled on other grounds by State v. Hill*, 878 N.W.2d 269 (Iowa 2016). "When causation does surface as an issue in a criminal case, our law normally requires us to consider if the criminal act was a factual cause of the harm." *Tribble*, 790 N.W.2d at 126-27; *accord State v. Tyler*, 873 N.W.2d 741, 750 (Iowa 2016) (declining to address whether criminal causation "still embraces notions of proximate or legal cause" as opposed to factual causation). "Conduct is a factual

---

[5] Because we find the district court did not err in denying Knight's motion for judgment of acquittal—as there was substantial evidence of record to support a finding that Knight acted willfully, intentionally, or knowingly—his counsel did not fail in an essential duty by not objecting to the submission of these jury instructions. *See State v. Brothern*, 832 N.W.2d 187, 192 (Iowa 2013) ("We will not find counsel incompetent for failing to pursue a meritless issue." (citation omitted)). Similarly, Knight cannot establish prejudice.

cause of harm when the harm would not have occurred absent the conduct."

*Asher v. OB-Gyn Specialists, P.C.*, 846 N.W.2d 492, 500 (Iowa 2014) (citation

omitted); *see also Tribble*, 790 N.W.2d at 127 ("The conduct of a defendant is a

'factual cause of harm when the harm would not have occurred absent the

conduct.'" (citation omitted)). Courts have labelled this factual cause requirement

the "but for" test. *See Tribble*, 790 N.W.2d at 127; *see also State v Marti*, 290

N.W.2d 579, 585 (Iowa 1980).

Knight argues his trial counsel failed an essential duty by not requesting

an instruction that his action or inaction was a "substantial factor" in bringing

about harm to K.P. and that the harm would not have happened "but for" his

action or inaction.[6] While Knight labels his argument as one regarding

"proximate causation," Knight disputes, in effect, factual causation.[7] *See*

---

[6] This is not a circumstance where the defendant relies upon an alleged superseding or intervening event to relieve him of the results of his wrongful acts. *See State v. Adams*, 810 N.W.2d 365, 372 (Iowa 2012) ("Except where multiple acts contribute to cause a consequence, the determination of factual causation turns simply on whether 'the harm would not have occurred absent the [defendant's] conduct.'" (alteration in original) (citation omitted)).

[7] Notably, the marshalling instruction does not contain the term "causation." Courts have noted the replacement of the term "cause" with other terms such as "results in" indicates proximate causation is not required. *See, e.g., Unites States v. Houston*, 406 F.3d 1121, 1123 (9th Cir. 2005) (noting "[p]roximate cause is not a necessary element of every crime" and finding proximate cause was not required where the statute provided injury must "result from" the distribution of controlled substances); *People v. Schaefer*, 703 N.W.2d 774, 786 n.67 (Mich. 2005) (noting, had the legislature not wanted to apply the standard of proximate causation, "the Legislature would have instead used the words '*results* in death' rather than '*causes* the death'"); *People v. McGuire*, No. 2-10-1248, 2011 WL 11555156, at *3 (Ill. App. Ct. Nov. 1, 2011) ("[T]he State was not required to prove that defendant's act was the proximate cause of the victim's death; rather, it was required to prove only that defendant's act 'result[ed] in the death of a person." (second alteration in original) (citation omitted)). This does not, however, mean *factual causation* does not apply. *See, e.g., Houston*, 406 F.3d at 1125 ("Cause-in-fact is required by the 'results' language, but proximate cause, at least insofar as it requires that the death have been foreseeable, is not a required element."); *People v. Wood*, 741 N.W.2d 574, 578 (Mich. Ct. App. 2007) (noting the statute at issue "provides the causation element 'results in'" thus, "the only causation element the prosecution had to establish . . . was

*Thompson v. Kaczinski*, 774 N.W.2d 829, 837-38 (Iowa 2009) (noting "a determination of whether the actor's conduct was a substantial factor in causing the harm at issue" is "a question properly addressed under the factual cause rubric").

"In criminal cases, the court is required to instruct the jury on the definition of the crime." *State v. Kellogg*, 542 N.W.2d 514, 516 (Iowa 1996); *see also State v. Becker*, 818 N.W.2d 135, 141 (Iowa 2012) ("In a criminal case, the district court is required to instruct the jury as to the law applicable to all material issues in the case."). "[T]he court is not required to give any particular form of an instruction; rather, the court must merely give instructions that fairly state the law as applied to the facts of the case." *Becker*, 818 N.W.2d at 141 (citation omitted). "Generally understood words of ordinary usage need not be defined; however, technical terms or legal terms of art must be explained." *Kellogg*, 542 N.W.2d at 516. When challenged, jury instructions must be reviewed as a whole, not individually. *Becker*, 818 N.W.2d at 141.

While factual causation is a necessary element of the claim, Knight fails to indicate how the jury instructions provided failed to express this to the jury. The instructions given explicitly required the jury to find Knight's acts "creat[ed] a substantial risk," "resulted in physical injury," or "deprived [K.P.] of necessary

---

factual causation"). *See also Burrage v. United* States, 134 S. Ct. 881, 887-88 (2014) ("'Results from' imposes, in other words, a requirement of actual causality. . . . [C]ourts regularly read phrases like 'results from' to require but-for causality." (citation omitted)); *Hennings*, 791 N.W.2d at 834 ("The legislature's use of the words 'because of' in [the applicable statute] requires that the defendant's prejudice or bias be a factual cause of the act."); *Scoggins v. Wal-Mart Stores, Inc.*, 560 N.W.2d 564, 567 (Iowa 1997) ("It is sufficient here to observe that despite the various terms used to state the causation analysis, we have consistently required a plaintiff to meet the traditional but-for test of causation in fact." (citation omitted)).

shelter or supervision . . . in which the deprivation substantially harmed [K.P.]'s health." In turn, these acts or inactions must have "resulted in death." Thus, a causation element was included in the instructions. *See Theus v. State*, No. 13-0773, 2014 WL 1245451, at *3 (Iowa Ct. App. Mar. 26, 2014) ("Under the first element in [the defendant's] case, the jury had to find 'the defendant used a pistol to wound [the victim].' A finding as to that element necessarily included a finding of causation.").

Instead, Knight appears to aver a definitional instruction on the factual-causation standard was necessitated by the inclusion of the terms "creating," "resulted," and "deprived" in the marshalling instruction.

Applying the ordinary, dictionary definition, "creating" means "to bring into existence," "to cause to be or to produce by fiat or mental, moral, or legal action," "to cause or occasion," or "to make or bring into existence." *Webster's Third New International Dictionary* 532 (unabr. ed. 2002). "Resulted" is defined as "to proceed, spring, or arise as a consequence, effect, or conclusion." *Id.* at 1937. To "deprive" means to "take away" or "to keep from."[8] *Id.* at 606-07.

We are convinced the terms "creating," "resulted," and "deprived" are readily understood by the layperson and are not technical or legal terms requiring further definition. *See State v. Reid*, No. 11-0671, 2012 WL 837166, at *2 (Iowa Ct. App. Mar. 14, 2012) ("The court must define the crime, but need not define every word in an instruction if the words are of ordinary usage and generally understood."); *see also Hall v. State*, No. 02-0060, 2003 WL 1524140, at *3

---

[8] The marshalling instruction does not provide the deprivation must have "caused" or "resulted in" substantial harm, but that the deprivation itself "substantially harm" the child. This leaves no room for other potential causes.

(Iowa Ct. App. Mar. 26, 2003) (finding the term "participating" was "a term of common usage and readily understandable," thus exclusion of the more expansive statutory definition was not detrimental to the defendant (citation omitted)). These terms necessarily indicate, and require a finding of, the requisite factual causation. By finding Knight either willfully, knowingly, or intentionally acted or failed to act, and that said acts or inactions created, deprived, or resulted in harm, the jury necessarily made a finding of causation. *See State v. Patrick*, No. 15-0207, 2016 WL 1130575, at *3 (Iowa Ct. App. Mar. 23, 2016) (finding counsel was not ineffective for failing to request a jury instruction defining causation where the court used the uniform instruction that "'expressly require[d] proof that the defendant's act or acts set out in' the first element—the criminal act of intoxicated driving—'caused a death'" (citation omitted)). Counsel did not fail to perform an essential duty.

### 2. Prejudice

Even if counsel failed to perform an essential duty regarding a proximate-causation instruction, Knight would have to show prejudice resulted from his counsel's failure to introduce the instruction. Prejudice is shown by demonstrating a reasonable probability that but for counsel's errors, the result of the proceedings would have been different. *See Ledezma v. State*, 626 N.W.2d 134, 143 (Iowa 2001). Based upon the evidence summarized above, Knight cannot demonstrate he was prejudiced by his trial counsel's failure to request a proximate-causation instruction. *See Washburne v. State*, No. 03-0186, 2004 WL 893929, at *4 (Iowa Ct. App. Apr. 28, 2004) (finding "[t]here is no reasonable probability that, had a separate proximate cause instruction been given, [the

defendant] would have been acquitted"); *State v. Lillie*, No. 03-0523, 2004 WL 434059, at *3 (Iowa Ct. App. Mar. 10, 2004) (finding, even had trial counsel requested a jury instruction defining "peace officer," it "would not have changed the outcome of the trial on either charge").

## IV. Conclusion

For the foregoing reasons, we affirm Knight's conviction and sentence.

**AFFIRMED.**