# IN THE COURT OF APPEALS OF IOWA

No. 18-0522
Filed March 6, 2019

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**TOBY RICHARDS,**
Defendant-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Joel W. Barrows, Judge.

Toby Richards appeals from judgment and sentences imposed upon his convictions for domestic abuse assault, third or subsequent offense; domestic abuse assault by strangulation; and possession of a firearm by a domestic abuse offender. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR RESENTENCING.**

Lauren M. Phelps, Davenport, for appellant.

Thomas J. Miller, Attorney General, and Darrel Mullins, Assistant Attorney General, for appellee.

Heard by Vogel, C.J., Vaitheswaran, J., and Danilson, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**DANILSON, Senior Judge.**

Toby Richards appeals from judgment and sentences imposed upon his convictions for domestic abuse assault, third or subsequent offense; domestic abuse assault by strangulation; and possession of a firearm by a domestic violence offender. *See* Iowa Code §§ 708.2A(4), 708.2A(5), 708.2A(7)(b), 724.26(2)(a), 902.3, 902.9, 902.13 (Supp. 2017). He asserts the trial court erred in allowing bodycam video of the complaining witness under the excited-utterance exception to the hearsay rule. He also contends the court abused its discretion in allowing evidence of his prior bad acts. He argues there in insufficient evidence to sustain the convictions, the court erred in failing to give his requested instruction about expert-witness testimony, and his confrontation rights were violated. Richards also challenges the sentences imposed.

We find no error in the admission of the bodycam video and no abuse of discretion as to admission of prior bad acts on the grounds asserted. We find sufficient evidence to sustain the convictions of domestic abuse assault, third or subsequent offense, and domestic abuse assault by strangulation. However, we find there is insufficient evidence of possession of a firearm to sustain that conviction. The district court did not abuse its discretion in denying Richards' proposed instruction as to expert-witness testimony. Because we reverse the conviction on count 3, we remand for resentencing, at which time Richards may assert his request that he be allowed to serve his sentences for prior offenses concurrently with the sentences for the instant convictions.

**I. Background Facts and Proceedings.**

Toby Richards was charged on August 6, 2017, by complaint with domestic abuse assault as a third or subsequent offender. A no-contact order protecting Emily issued that day.[1]

Less than a week later, Emily moved to dismiss the no-contact order. At a hearing on the motion to dismiss, Emily testified, "He's never done anything to hurt me ever." She stated a person who had just been released from prison for attempted murder had assaulted her on August 6. She denied talking to an attorney from the Scott County Attorney's office (who made a statement to the contrary). She also said that Richards did not have a gun: "Toby doesn't have a gun. . . . It wasn't Toby's, and he did not have dominion or control over it." She also stated, "I have never called the police on Toby." The district court denied the motion to dismiss the no-contact order.

A trial information was filed on September 13 charging Richards with three offenses—domestic abuse assault as a third or subsequent offender, domestic abuse assault by strangulation causing bodily injury, and possession of a firearm by a domestic violence offender—all class "D" felonies. At the criminal trial held in December 2017, the manager of a convenience store testified Emily had come to the store on August 6 at about 1:45 p.m. bloody and crying, and asked him to call police and have them meet her by her red Toyota at a nearby McDonald's store "because she said he would find her here."

---

[1] We will refer to the protected party throughout the opinion by her first name only.

Responding officers, Brian Hanssen and Dennis Tripp, encountered a woman who was "distraught," "crying," "shaking," and bleeding. Officer Tripp's bodycam video shows he asked the woman, "What's going on?" The woman told Officer Tripp, "he beat me up" and "he said 'give me the .22'." She later identified herself and stated her boyfriend, Toby Richards, had punched and kicked her in the head, "he wants me to die," and "he tried to choke me again but I felt that I could breathe this time." She told Officer Tripp that Richards told her to kill herself with the .22. Emily asked the officer if he knew why she could not see out of her left eye. Emily stated that if Richards found out she had called police, "he's going to kill me." Officer Tripp recalled Emily was "just very upset." He testified Emily was bleeding and her mouth appeared injured. Her mouth and eye on the left side of her face were swollen.

Emily was transported to the hospital and remained upset and shaken. Photographs taken at the hospital show bruising and cuts on Emily's face and abrasions and blood on her hands.

Police went to the address for Richards that Emily had given them, which was just a few minutes away. Police created a perimeter around the residence. Richards' mother eventually gave officers permission to enter[2] and informed them Richards was hiding in the attic. Officers were able to convince Richards to emerge.

Officer Christina Thomas testified she responded to a domestic-assault dispatch to Richards' residence. She transported Richards to the county jail and

---

[2] The residence was rented to Richards' mother. Richards, his son, and Emily lived there with Richards' mother.

then returned to the residence upon receiving information that a firearm "involved in the earlier incident" was there. She was able to locate the weapon from the information received.

Officer Ashley Guffey testified that she, too, responded to Richards' residence about 2:00 p.m. on August 6. After Richards was detained, Officer Guffey went to the hospital to speak with Emily and photograph her injuries. Office Guffey testified Emily "was really upset" and "really shaken." She stated Emily "said she had been through a lot and was scared of the defendant." Officer Guffey testified Emily's injuries included swelling, redness, and a bruise underneath her left eye, a cut on her left eyelid, and redness in her left eye, her nose was swollen, her cheek was bruised, and her lips were cut and swollen. Emily also had cuts on her hands, cuts on the inside of her mouth, and a chipped tooth. Officer Guffey stated, "I had obtained information that there was a gun in the residence still, and I relayed that to the other officers, to go retrieve it."

Officer Jon Ronnebeck testified he obtained information concerning Richards' jail house phone calls. On August 6, Richards was on the phone from the jail and was told that the police had come and taken the gun. Richards stated, "I told her [Emily] that she should get it and kill herself." In a call on August 7, Richards told his son, "I did hit her." And later that day, he told his mother, "Look, what I did to her again, Mom. She has every right to be upset." In an August 27 phone call, Richards said he had told the classification staff, "I've been suffering from anger . . . that I'm lucky nobody has died."

A domestic-abuse therapist testified that it is not unusual for survivors of domestic abuse to deny that it occurred. She testified how abusers use violence

to maintain control over an intimate partner and described the cycle of violence— a "honeymoon" period, a building of tension, and then acute verbal, emotional, or physical abuse. She also testified it is not uncommon for victims to decline to participate in a prosecution because they know or think they know what will occur when the perpetrator is no longer incarcerated. She testified she had not met Emily or Richards.

The State was allowed to present testimony over Richards' relevance objections that on September 17, 2015, Richards admitted injuring Emily at the Jumer's casino and hotel in Rock Island, Illinois. Emily had swelling on the left side of her face and a "C" shaped cut to her temple. On May 1, 2016, police responded to Genesis East Hospital where they found Emily in a neck brace. Richards pled guilty to domestic abuse assault related to this incident (FECR377195). And on August 31, 2016, surveillance cameras at the Isle of Capri Casino captured video of Richards shoving Emily from a stool. An officer later found Emily lying on her back in pain. Richards pled guilty to domestic abuse assault for this incident (AGCR379842).

Richards intended to call Emily as a witness. However, through counsel, Emily informed the court she would "plead the Fifth" if called, and the court refused to require her to take the stand.

Richards testified in his own defense. He testified he got up at about 10:00 a.m. on August 6 and awakened Emily to ask "if she had handled it." "I was mad because she didn't keep her word." He stated Emily had not "take[n] care of what she said she would take care of." He stated he started calling her names,

told her their April 1st marriage was off, and "she wasn't worth my time anymore."

He further testified:

> I was mean to her, and I told her, you know, you got your dad's car, just get out of my life, get out of my son's life, get out of our life, you know. You're just—you're not doing what you say you're going to do, and I do what I say I'm going to do, just please get out. And I said no, just get the F out, just get out of our lives.
>
> And I left the room. We were in the bedroom at that time, and I left the room. And I was trying to cool off because I was way out of control, and I went into my son's room and he wasn't awake, and I went ouside just to cool off, so I could get calm and not act like an ass any longer.
>
> Whenever I came back in, I didn't see her, so I laid back down on the bed and my son came in and asked me what happened and I told him that we'd gotten into it, told him that she didn't keep her word, and he said yeah. And I looked for her and then I seen that her dad's car was gone.

When asked what time Emily left, Richards testified, "About 11, maybe." He stated his mother came to tell him the police were outside so he hid in the attic because he "was scared to death."

Richards admitted he had once had a .22 rifle but stated Emily was tasked with getting rid of it. He denied the rifle in evidence was his. He stated, "This is not my rifle, but that was the only—only thing I knew about a gun is I used to have a .22 rifle also, and to my understanding that it had been taken out of the house whenever I got my first domestic conviction."

On cross-examination Richards admitted he is prohibited from a possessing a firearm. He also attempted to explain his statement in the jail house phone call, "I hit her," stating: "Whenever I said I hit her, that was referring to the past incident." And, "What I'm saying is that I didn't hit her this time, and I was saying that it had to do with another incident."

The jury found Richards guilty as charged. The district court sentenced him to three, concurrent sentences not to exceed five years, with a three-year mandatory minimum, which were to be served consecutively to his convictions for the May 1 (FECR377195) and August 21, 2016 (AGCR379842) domestic abuse assault incidents. Richards now appeals.

## II. Scope and Standards of Review.

"Although we normally review evidence-admission decisions by the district court for an abuse of discretion, we review hearsay claims for correction of errors at law." *State v. Smith*, 876 N.W.2d 180, 184 (Iowa 2016). "'[T]he question whether a particular statement constitutes hearsay presents a legal issue,' leaving the trial court no discretion on whether to admit or deny admission of the statement." *Id.* (quoting *State v. Dullard,* 668 N.W.2d 585, 589 (Iowa 2003)).

"In considering whether the trial court properly admitted prior-bad-acts evidence, we apply an abuse-of-discretion standard of review." *State v. Taylor*, 689 N.W.2d 116, 124 (Iowa 2004). The abuse-of-discretion standard means "we give a great deal of leeway to the trial judge who must make [a] judgment call." *State v. Newell*, 710 N.W.2d 6, 20-21 (Iowa 2006). "If an abuse of discretion occurred, reversal will not be warranted if error was harmless." *State v. Reynolds*, 765 N.W.2d 283, 288 (Iowa 2009).

We may affirm an evidentiary ruling on any valid alternative ground supported by the record. *See DeVoss v. State*, 648 N.W.2d 56, 62 (Iowa 2002). We give deference to the lower court's finding of facts because it has a better opportunity to assess the credibility of witnesses, but we are not bound by them. *State v. Turner*, 630 N.W.2d 601, 606 (Iowa 2001).

We review claims involving the Confrontation Clause de novo. *State v. Bentley*, 739 N.W.2d 296, 297 (Iowa 2007).

We review a district court ruling denying a motion for judgment of acquittal for errors of law. *State v. Hearn*, 797 N.W.2d 577, 579 (Iowa 2011).

**III. Discussion.**

***A. Bodycam Video.*** Richards first challenges the district court's admission of Officer Tripp's bodycam video, which includes Emily's statements implicating Richards. He asserts those statements were inadmissible hearsay. He also contends admission of the video violated his right to confront the witness.

***1. Hearsay.*** "Hearsay 'is a statement, other than one made by the declarant while testifying at . . . trial, . . . offered in evidence to prove the truth of the matter asserted.'" *Newell*, 710 N.W.2d at 18 (citation omitted). Such statements "must be excluded as evidence at trial unless admitted as an exception or exclusion under the hearsay rule or some other provision." *Id.* (citation omitted). Iowa Rule of Evidence 5.803 sets forth numerous exceptions to the rule against hearsay, proclaiming certain statements are not excluded "regardless of whether the declarant is available as a witness." Rule 5.803(2) allows the admission of "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused."

> The application of the exclusion lies largely within the discretion of the trial court, which should consider (1) the time lapse between the event and the statement, (2) the extent to which questioning elicited the statements that otherwise would not have been volunteered, (3) the age and condition of the declarant, (4) the characteristics of the event being described, and (5) the subject matter of the statement.

*State v. Atwood*, 602 N.W.2d 775, 782 (Iowa 1999). "In construing the exception, the Iowa court has noted the statement must be spontaneous and not the product of reflection or fabrication. The determination of the foundational requirements for admission of evidence under the excited utterance exception is within the trial court's discretion." *State v. Watts*, 441 N.W.2d 395, 398 (Iowa Ct. App. 1989) (citations omitted).

The district court allowed Emily's statements via the bodycam recording based upon its finding that the statements were excited utterances. Richards argues, however, that because the statements were made more than two hours after Richards' encounter with Emily, the exception is inapplicable. This is based upon Richards' version of the August 6 events, i.e., that Emily left the residence at 11:00 a.m. and her whereabouts were unaccounted for until the 911 call about 1:45 p.m. He also relies heavily on Emily's testimony at the hearing to dismiss the no-contact order in which she denied Richards had ever hit her and that she was assaulted by some unnamed, recently-released person. The district court apparently did not give credence to Emily's recantation during the no-contact order hearing.[3]

Here, the time lapse between the assault and the statements was not long. Emily drove from the residence and then traveled just a few blocks in an attempt to find help. Although the exact amount of time that had lapsed is not known, Emily was still bleeding when officers approached her. *Cf. Atwood*, 602 N.W.2d at 782 (upholding a statement as an excited utterance made "at most two and one-half

---

[3] We note the recantation is contradicted by Richards' own admissions and two prior convictions for domestic abuse assault against Emily.

hours" after the event); *State v. Mateer*, 383 N.W.2d 533, 535 (Iowa 1986) (made more than an hour after the event); *State v. Stafford*, 23 N.W.2d 832, 835–36 (Iowa 1946) (made fourteen hours later). Although Officer Tripp asked Emily a general question about what had happened, "the fact that a statement was prompted by a question does not automatically disqualify it as an excited utterance." *State v. Harper*, 770 N.W.2d 316, 320 (Iowa 2009); *Atwood*, 602 N.W.2d at 782-83 (finding a statement in response to "what happened" to be excited utterance); *State v. Mateer*, 383 N.W.2d 533, 534-36 (Iowa 1986) (noting witnesses to assault "hysterical" and tearful; officer's questions merely anticipatory of their condition); *Stafford*, 23 N.W.2d at 835 (allowing witness's statements in response to question "what had happened"). And Officer Tripp did not know why Emily had asked the store manager to call police and why she did not want to wait at the store. Both the store manager and the responding officers described Emily as crying and upset. The trial court was within its discretion to find Emily's statements were spontaneous and not the product of reflection or fabrication. *See Watts*, 441 N.W.2d at 398. Emily's condition at the time of the statements supports the court's determination the statements were excited utterances. *See id.*

       **2. Confrontation rights.** Richards also asserts the admission of Emily's statements via the bodycam recording violated his confrontation rights.[4] The Sixth Amendment prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is "unavailable to testify, and the

---

[4] Richards does not seek a different interpretation of his confrontation rights under the state and federal constitutions and, therefore, we do not interpret the two differently. *See In re J.C.*, 877 N.W.2d 447, 452 (Iowa 2016).

defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 54 (2004). "If the statements are testimonial, they are inadmissible against [the defendant] at trial; but if they are nontestimonial, the Confrontation Clause does not prevent their admission." *J.C.*, 877 N.W.2d at 452 (citation omitted).

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Hammon v. Indiana*, 547 U.S. 813, 822 (2006); *see also Ohio v. Clark*, 135 S. Ct. 2173, 2180-81 (2015).[5]

The district court determined that Emily's statements were made in the course of an ongoing emergency, rendering them non-testimonial. We agree with the district court's ruling.

**B. Prior Bad Acts Evidence.** Richards contends the district court abused its discretion in allowing evidence of prior assaults against Emily.

---

[5] In *Ohio v. Clark*, the Supreme Court stated:
> [A] statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial. "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." But that does not mean that the Confrontation Clause bars every statement that satisfies the "primary purpose" test. We have recognized that the Confrontation Clause does not prohibit the introduction of out-of-court statements that would have been admissible in a criminal case at the time of the founding. Thus, the primary purpose test is a necessary, but not always sufficient, condition for the exclusion of out-of-court statements under the Confrontation Clause.

135 S. Ct. at 2180 (citations omitted).

"A court abuses its discretion when its 'discretion was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *State v. Long*, 814 N.W.2d 572, 576 (Iowa 2012) (citation omitted). "'A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law.'" *State v. Putman*, 848 N.W.2d 1, 7 (Iowa 2014) (citations omitted).

In order for prior-bad-acts evidence to be admissible under Iowa Rule of Evidence 5.404(b):

> (1) "the evidence must be relevant and material to a *legitimate* issue in the case other than a general propensity to commit wrongful acts"; (2) "there must be clear proof the individual against whom the evidence is offered committed the bad act or crime"; and (3) if the first two prongs are satisfied, "the court must then decide if [the evidence's] probative value is substantially outweighed by the danger of unfair prejudice to the defendant."

*State v. Richards*, 879 N.W.2d 140, 145 (Iowa 2016) (alteration in original) (quoting *State v. Sullivan*, 679 N.W.2d 19, 25 (Iowa 2004)).

During the discussion between the court and counsel on Richards' motion in limine challenging the prior bad acts, the following colloquy occurred:

> MR. TUPPER [defense counsel]: Thank you, your Honor. The sole concern of the jurors should be on was there an assault, who committed the assault. When we start allowing all these prior bad acts to come in, the danger is the jury will simply confuse—decide that in fact my client is quote unquote a bad guy, instead—
> THE COURT: Well, obviously the courts have considered this in the domestic violence context, and they've considered it with issues such as motive, intent, absence of mistake or accident. Would you agree with that?
> MR. TUPPER: I would agree.
> THE COURT: Okay.
> MR. TUPPER: And again, your Honor, the question here I believe in this case is really very specifically related to identity. It

isn't going to be a question about whether it occurred, but whether—but who committed that assault.

THE COURT: Well, that certainly invokes motive, intent, absence of mistake or accident, doesn't it?

MR. TUPPER: I think it certainly does, your Honor. As I understand, though, the court is engaging in a balancing act in terms of the probative value versus the prejudicial effect. It seems to me that, again, the focus here is on the identity of the perpetrator, and that that will be shown through other evidence. Again, this would seem to have little probative value and the potential for a very high prejudicial effect.

THE COURT: Obviously related to motive, intent, absence of mistake or accident is another issue that the court discusses in these cases, and that is the nature of the defendant's relationship and feelings towards the victim. You would agree with that, wouldn't you?

MR. TUPPER: I would.

. . . .

THE COURT: And it does appear that this has been considered extensively by the Iowa courts. I would note, including in a case involving Mr. Richards. There's a few things the court needs to discuss in this regard, and there is a three-part test. First of all, the evidence must be relevant and material to a legitimate issue in the case other than, obviously, the general propensity to commit wrongful acts. I do believe in the context of this case the evidence goes to motive, intent, absence of mistake or accident, and it does go to the nature of the defendant's relationship and his feelings toward the victim.

The second aspect of the test is there must be clear proof that the defendant committed these acts. I take it no one's disputing that, as these are convictions. Or are you disputing that, Mr. Tupper?

MR. TUPPER: At least two of the actions, your Honor, are currently subject to postconviction matters, and my client is disputing that. I don't believe that he is disputing the matter related to the incident at the casino in Rock Island.

THE COURT: But as it stands, they are convictions at this point, is that correct?

MR. TUPPER: That is correct, your Honor.

THE COURT: The court thinks the second prong is satisfied by that. And of course the third prong is the evidence—is the probative value of the evidence outweighed by the prejudicial effect. There are several things that the Court needs to consider there. It's clear from what counsel have told me during the course of these proceedings that the victim either has refused to testify for the State, or will testify for the defendant. As we just discussed, it seems clear to the court that the priors were committed by the defendant. The evidence that the State intends to put on by way of prior bad acts involving [Emily] strongly go to the factors that the court discussed

under the first part of this test. In this court's opinion, they're not unduly prejudicial versus the probative value, as I consider the case law cited by the State, which seems to be compelling on this issue.

I do think that there are some limitations that have to be put in place with respect to their admission. Obviously, and the State has indicated this, they can only put on the priors that involve [Emily]. I think that in questioning [Emily] the State should limit itself to short and concise questions of her. I do think that there needs to be a limiting instruction in this case as to what the jury can use these acts for, and I'd like to hear counsel address what exactly they would like that limiting instruction to be. Obviously they go to motive, intent, absence of mistake or accident. I think they also go to the nature of the defendant's relationship and the feelings toward the victim.

"Domestic violence is never a single isolated incident. Rather, domestic violence is a pattern of behavior, with each episode connected to the others." *State v. Taylor*, 689 N.W.2d 116, 128 n.6 (Iowa 2004) (quoting Jane H. Aiken & Jane C. Murphy, *Evidence Issues in Domestic Violence Civil Cases*, 34 Fam. L.Q. 43, 56 (2000)). "Thus, "[e]vidence of prior bad acts is especially relevant and probative in domestic violence cases because of the cyclical nature of domestic violence."" *Id.* We find no reason to disturb the district court's ruling on this issue.

On appeal, Richards asserts, "The large amount of bad acts evidence simply overwhelmed the current facts." This claim is best left for a possible postconviction proceeding because the only objections made at trial were that the evidence was not relevant. Richards has made no claim on appeal that counsel was ineffective in challenging the amount of bad acts evidence.

### C. Sufficiency of the Evidence.

A motion for judgment of acquittal challenges the sufficiency of the evidence. *State v. Serrato*, 787 N.W.2d 462, 465 (Iowa 2010). The jury's verdict is binding on appeal unless there is an absence of substantial evidence in the record to sustain it. *State v. Hennings*, 791 N.W.2d 828, 832 (Iowa 2010).

Evidence is sufficient if it could persuade a rational jury that the defendant was guilty beyond a reasonable doubt. *Id.* "The evidence must raise a fair inference of guilt and do more than create speculation, suspicion, or conjecture." *State v. Webb*, 648 N.W.2d 72, 76 (Iowa 2002). Generally, we will not resolve conflicts in the record, pass upon the credibility of witnesses, or weigh the evidence. *See State v. Hutchinson*, 721 N.W.2d 776,780 (Iowa 2006) (reserving those assessments for the jury). We view the record in the light most favorable to the State. *State v. Showens*, 845 N.W.2d 436, 439–440 (Iowa 2014).

*1. Domestic abuse assault.* Richards contends there is insufficient evidence to sustain his conviction under count 1, domestic abuse assault. Richards notes that the jury instructions "correctly set out the elements of the offense" of domestic abuse assault:

> (1) On or about the 6th day of August, 2017, the defendant did an act which was meant to cause pain or injury; or result in physical contact which was insulting or offensive; or place [Emily] in fear of immediate physical contact which would have been painful, injurious, insulting or offensive to [Emily].
> (2) The defendant had the apparent ability to do the act.
> (3) The act occurred between persons who were family or household members residing together at the time of the incident or persons who were family or household members residing together within the past year but were not residing together at the time of the incident.

Viewing the evidence in the light most favorable to the State, we find substantial evidence supports the conviction for domestic abuse assault. Emily's statements to the responding officers;[6] her injuries, which are visible on the bodycam video and the subsequent photographs taken at the hospital; and

---

[6] Richards' repeated references to Emily's testimony at the hearing on the application to lift the no-contact order were never presented to the jury is this matter.

Richards' own admissions made during the jailhouse phone calls that he hit her support the jury's finding of domestic abuse assault. The jury was free to reject Richards' testimony as to his version of the day's events. *See State v. Anderson*, 517 N.W.2d 208, 211 (Iowa 1994) ("Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury was free to reject certain evidence and credit other evidence."), *overruled on other grounds by State v. Heemstra*, 721 N.W.2d 549 (Iowa 2006).

*2. Domestic abuse assault by strangulation.* Richards asserts there is insufficient evidence to sustain the conviction for domestic abuse assault by strangulation.

A person is guilty of domestic abuse assault by strangulation "if the domestic abuse assault is committed by knowingly impeding the normal breathing or circulation of the blood of another by applying pressure to the throat or neck of the other person or by obstructing the nose or mouth of the other person." Iowa Code § 708.2A(2)(d).

In *State v. Kimbrough*, this court upheld a conviction for domestic abuse assault by strangulation. No. 16-1280, 2017 WL 2876244, at *2 (Iowa Ct. App. July 6, 2017). We noted the victim testified she had trouble breathing and her breathing was affected when the defendant put his hands around her neck. *Id.* In addition, an examining physician testified the victim had injuries consistent with strangulation, and the State introduced photographs of bruising on the victim's thoat. *Id.* "The statute does not require the State to prove [the victim']s breathing stopped or [she] lost consciousness. Rather, it requires the State to prove [the

defendant] 'impeded [the victim's] normal breathing' by applying pressure to the throat or neck."  *Id.* (quoting now Iowa Code § 708.2A(2)(d))

Here, the only evidence in the record supporting this charge is Emily's statement, "He tried to choke me again but I felt like I could breathe this time."  We have previously considered the definition of the term "choke," stating,

> We find no statute defining "choke" or "choked." We thus look to dictionary definitions to determine the meaning of the term.
> The term "choke" is defined as "to check or block normal breathing of by compressing or obstructing the trachea or by poisoning or adulterating available air."  *See* Webster's New Collegiate Dictionary 194 (1981).  To "check" is "to slow or bring to a stop," or "to restrain or diminish the action or force of."  Id. at 188.  To "block" is "to make unsuitable for passage or progress by obstruction," or "to hinder the passage, progress, or accomplishment of by or as if by interposing an obstruction."  Id. at 118.
> Under the foregoing definitions, choking can consist of as little as a momentary and slight slowing or diminishing of breathing.

*State v. Amadeo*, No. 11-1426, 2012 WL 2122262, at *6 (Iowa Ct. App. June 13, 2012).  Although *Amadeo* did not involve an assault by strangulation we find the analysis of the pertinent terms persuasive.

In a dissent in *Amadeo*, it was also noted,

> Experts in the field of domestic violence urge professionals to use the term "strangulation" when referring to external compression of the neck and "choking" when discussing internal airway blockage.  *See* Gael Strack & Casey Gwinn, *On the Edge of Homicide: Strangulation as a Prelude*, 26 Crim. Just. 32, 34 (Fall 2011) (noting that when a victim, perpetrator or witness uses the term "choking," "in nearly all cases, they are describing strangulation").

*Id.* at *9 (Tabor, J., dissenting).  Of course here, we do not know Emily's intent in her use of the term but it is clear she believed Richards was going to kill her.

Much like the facts in *Amadeo*, our "record on appeal gives no indication of either the length of time or the severity of the . . . choking.  For all that can be

determined from the record, it may have lasted only momentarily, and it may have only slightly slowed or diminished [the victim's] breathing." *See id.* at *6. The evidence reflects, however, by her statement to law enforcement officers that Emily's breathing was not entirely impeded. Viewing the evidence in the light most favorable to the State, we conclude the evidence raises a fair inference that Richards caused some level of blood flow or breathing to be impeded, although it may have only been momentarily or slight. Thus, we conclude there is sufficient evidence to sustain the conviction and affirm as to this count.

**3. *Possession of a firearm.*** Richards also challenges the sufficiency of the evidence that he possessed a firearm. Richards stipulated he was prohibited from possessing a firearm. And there is no doubt a firearm was found in the residence where Richards lived. But, possession requires more than that a defendant is in the same location as a firearm. Here, the State asserts Richards had constructive possession of the firearm.

Constructive possession exists when the evidence shows the defendant has knowledge of the presence of firearm and has the authority or right to maintain control of it. *See State v. Reed*, 875 N.W.2d 693, 705 (Iowa 2016); *see also State v. Maxwell*, 743 N.W.2d 185, 193 (Iowa 2008) (constructive possession of controlled substance). "Constructive possession may be proved by inferences." *Reed*, 875 N.W.2d at 705.

> "The existence of constructive possession turns on the peculiar facts of each case." Constructive possession may be inferred when the drugs or firearms are found on property in the defendant's exclusive possession. . . . When the premises are jointly occupied, additional proof is needed.
> "[P]roximity to the [contraband], though pertinent, is not enough to show control and dominion." We have identified several

nonexclusive factors to consider in determining whether the defendant possessed contraband discovered in jointly occupied structures:

(1) incriminating statements made by a person; (2) incriminating actions of the person upon the police's discovery of a controlled substance among or near the person's personal belongings; (3) the person's fingerprints on the packages containing the controlled substance; and (4) any other circumstances linking the person to the controlled substance.

The last factor is a "catchall" that captures other relevant circumstantial or direct evidence. "The evidence of guilt must generate more than mere suspicion, speculation, or conjecture."

*Id.* at 705-06 (citations omitted).

Here, the record provides no indication where the firearm was located in the residence. We have a bare statement from Richards on a jailhouse phone call— "yup"—in response to a statement that a firearm was taken away. Emily's statements to Officer Tripp were that Richards told her to get the rifle and shoot herself. This statement allows an inference that he knew there was a firearm on the premises, but does not support a finding that Richards exercised "dominion or control" over the weapon. On this record, we decline to conclude that proof of Richards' constructive possession of the firearm was sufficient to sustain the conviction. We reverse as to this count.

***D. Expert Witness Jury Instruction.*** The trial court instructed the jury:

You have heard testimony from persons described as experts. Persons who have become experts in a field because of their education and experience may give their opinion on matters in that field and the reasons for their opinion.

Consider expert testimony just like any other testimony. You may accept it or reject it. You may give it as much weight as you think it deserves, considering the witness's education and experience, and all the other evidence in the case.

Richards objected to the instruction, which is a slightly modified Iowa State Bar Association uniform jury instruction,[7] and asked that the court give this proposed alternate:

> You have heard testimony from Nikki E. regarding the effects of domestic violence. Nikki E.'s testimony about domestic violence is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in evaluating the believability of [Emily]'s statements.

"We generally review refusals to give jury instructions for errors at law; however, if the requested jury instruction is not required or prohibited by law, we review for abuse of discretion." *State v. Plain*, 898 N.W.2d 801, 816 (Iowa 2017). "Iowa law requires a court to give a requested jury instruction if it correctly states the applicable law and is not embodied in other instructions." *Id.* (citation omitted).

We find no authority for the sentence in Richards' proposed instruction— "You may consider this evidence only in evaluating the believability of Emily Emily's statements." Our rules of evidence provide the following standard for the admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Iowa R. Evid. 5.702. Thus, "[e]xpert testimony is admissible if it is reliable and 'will assist the trier of fact in resolving an issue.'" *State v. Rodriquez*, 636 N.W.2d 234, 245 (Iowa 2001) (citations omitted). Our supreme court has allowed testimony

---

[7] Uniform Jury Instruction No. 200.37 includes in the last sentence, "considering the witness's education and experience, *the reasons given for the opinion*, and all the other evidence in the case." The emphasized phrase was not included in the instruction given.

from domestic abuse experts to help the jury understand the nature of the relationship involving domestic violence as well as to understand a defendant's conduct and a victim's reaction to that conduct. *See id.* While the *Rodriquez* court cited a case that allowed expert testimony on the issue of a victim's credibility, *see id.* (citing *State v. Griffin*, 564 N.W.2d 370, 374 (Iowa 1997)), it did not limit the jury's consideration to such an extent. The district court did not abuse its discretion in denying Richards' proposed instruction.

**E. Consecutive Sentences.** Lastly, Richards contends the district court abused its discretion in ruling the sentences for the convictions should would run consecutive to sentences from two other convictions.

After judgment was entered in this case, the district court heard the question of probation revocation in two cases: FECR377195 and AGCR379842—both of which related to previous assaults against Emily. The court revoked Richard's probation. Richards asked that he be allowed to serve his sentences for these offenses concurrently with the sentences for the instant convictions. Because we are reversing one of the convictions and remanding for resentencing, the district is free to consider Richards's claims.

**IV. Conclusion.**

We find no error in the admission of the bodycam video and no abuse of discretion as to admission of prior bad acts on the grounds asserted. We find sufficient evidence to sustain the convictions of domestic abuse assault, third or subsequent offense, and domestic abuse assault by strangulation. However, we find there is insufficient evidence of possession of a firearm to sustain that conviction. The district court did not abuse its discretion in denying Richards'

proposed instruction as to expert-witness testimony. Because we reverse the conviction on count 3, we remand for resentencing, at which time Richards may assert his request that he be allowed to serve his sentences for prior offenses concurrently with the sentences for the instant convictions.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR RESENTENCING.**